Argued October 7, decided October 27, 1908.

## SCHINDLER *v.* PARZOO.

[97 Pac. 755.]

CANCELLATION OF INSTRUMENTS—MENTAL INCOMPETENCY — CONSIDERATION.

1. In suing to avoid a deed on account of the grantee's fraud and plaintiff grantor's mental incapacity, plaintiff need not show that the deed was made without consideration or for an inadequate consideration, though, had she relied solely upon want of consideration, she must have shown that fact, or, had she relied upon constructive fraud, she must have shown what the consideration was and an offer to return it.

INSANE PERSONS—EVIDENCE—PRESUMPTIONS.

2. Generally one is presumed to be sane, and the burden is upon one asserting the contrary to prove it; but the appointment of a guardian for one alleged to be insane by a court having jurisdiction creates a presumption of insanity.

INSANE PERSONS—EVIDENCE—SANITY—ADJUDICATION—EFFECT.

3. An adjudication of insanity is not necessarily evidence of insanity at a prior time, but when it is shown that the person's condition has been the same for a long time, and was the same at the time of the act to be affected by it as when the adjudication was made, the adjudication is evidence of previous insanity, and where mental weakness and incapacity are the concomitants of old age, and have been gradual and continuous for a long time, and not the result of any recent or intervening cause, such evidence is proper to show that the conditions were the same as when the adjudication was made.

DEEDS—GRANTOR'S MENTAL INCAPACITY—EVIDENCE—BURDEN OF PROOF.

4. In an action to cancel a deed for plaintiff grantor's mental incapacity, it appeared that the deed covered practically all her property; that she was

adjudged incompetent 10 days after making the deed; that she was 70 years old, and for some time prior thereto had been suffering mental and physical decline. *Held* that, under such facts, the admission in the answer of the adjudication placed the burden on defendant to plaintiff's competency, and that defendant did not defraud plaintiff.

DEEDS — EXECUTION — GRANTOR'S MENTAL CAPACITY — EVIDENCE — WEIGHT

5. Evidence *held* to show that a grantor was not mentally competent to comprehend the nature of the transaction in which she executed her deed.

From Douglas: JAMES W. HAMILTON, Judge.

Statement by MR. COMMISSIONER SLATER.

This suit is prosecuted in the name of Elizabeth Schindler, an alleged incompetent person, by Ira South, her guardian, against Adeline Parzoo, to adjudicate an adverse claim to certain real property consisting of 4½ acres, situate in the suburbs of the City of Roseburg, alleged to belong to plaintiff and to be in her possession, and to be of the value of $1,500.

It is alleged that Ira South, who is plaintiff's son, on June 18, 1906, upon his written petition and after due notice and hearing, was duly appointed by the county court of Douglas County guardian of the person and estate of plaintiff, who was adjudged to be incapable of taking care of herself and not competent to manage her estate, and that he subsequently qualified as such guardian. The asserted adverse claim is alleged to arise from, and to be based upon, a recorded deed purporting to have been executed by plaintiff on January 8, 1906, and to convey to defendant the fee-simple title to said property, but that at the execution thereof, and for a long time prior thereto, plaintiff was of unsound mind and incapable of transacting her own business; that she was illiterate, not being able to read or write, was of advanced age, being more than 67 years old, and sick in bed; that the defendant was acting as plaintiff's nurse, and, taking advantage of her imbecility of mind and weakened and helpless condition, fraudulently induced and persuaded her to execute the deed. For this reason the deed is al-

leged to be void, and the prayer is that it be canceled of record.

After the overruling of a general demurrer to the complaint, defendant answered, denying all the material averments of the complaint, excepting the alleged adjudication of plaintiff to be an incompetent person, the appointment of her son as guardian and his qualification, the execution of the deed, and that, by virtue thereof, she claims the ownership of the property described, which is denied to be worth more than $800. As an affirmative defense, it is alleged that the deed was made by plaintiff freely and voluntarily for a valuable consideration. These averments of the answer were denied by the reply, and particularly that the deed was made for a valuable or any consideration. During the progress of the trial, plaintiff was permitted to amend her complaint by adding a charge, that on January 8, 1906, she was very sick, feeble, and not expected to live, and that defendant, a short time before the execution of the deed, administered to her morphine and other poisonous drugs, with the intent and for the purpose of causing her to be in a stupor, and which had that effect, and caused her to be in an unconscious condition for several hours thereafter.

The court found that plaintiff was an aged and ignorant person, feeble in mind and body, and suffering from a severe and dangerous illness from which she had not recovered, and that at the time of the execution of the deed her mind was weak and feeble to the extent that she was incapable of contracting, and was persuaded to make said conveyance by the presence and influence of defendant. A decree was entered setting aside the deed, from which defendant appeals. AFFIRMED.

For appellant there was a brief over the names of *Cardwell & Watson* and *Fullerton & Orcutt,* with an oral argument by *Mr. James C. Fullerton.*

For respondent there was a brief and oral arguments by *Mr. John T. Long* and *Mr. Frank G. Micelli.*

Opinion by Mr. Commissioner Slater.

1. The only objection to the complaint urged by counsel for defendant on her demurrer is that there is no averment that the deed was made without consideration, or that the consideration was inadequate, and it is contended that, for that reason, the complaint is insufficient. If, to avoid her deed, plaintiff relied solely upon either the want of a consideration or upon actual or constructive fraud in the procurement of its execution, it would undoubtedly be essential to a good cause of action to allege, in the first instance, that there was no consideration, or, in the second instance, of what the consideration consisted, and an offer to return it; that is, offer to put the other party in *statu quo: State* v. *Blize,* 37 Or. 404 (61 Pac. 735) ; *Crossen* v. *Murphy,* 31 Or. 114 (49 Pac. 858). But in this case plaintiff's chief reliance to avoid the contract is upon her mental incompetency at the time of the execution of the deed; and, if it be found to exist, it is not essential to state what may have been the consideration. The rule has been stated by Mr. Justice Moore, in *Crossen* v. *Murphy,* to be that the obligation to return or offer to return whatever has been received under a contract by one who is seeking to rescind it, rests upon one "who is mentally responsible," thereby impliedly conceding, at least, that one who was not mentally responsible at the making of a contract is not under such obligation. In *Gibson* v. *Soper,* 6 Gray (Mass.), 279 (66 Am. Dec. 414), it was held that an insane person or his guardian, without first restoring the consideration to the grantee, may bring an action to recover land of which a deed was made by him while insane; the reason given by Mr. Justice Thomas, who rendered the opinion, being: "To say that an insane man before he can avoid a voidable deed must put the grantee in *statu quo* would

be to say, in effect, that in a large majority of cases his deed shall not be avoided at all. The more insane the grantor was when the deed was made, the less likely will he be to retain the fruits of his bargain, so as to be able to make restitution. If he was so far demented as not to know or recollect what the bargain was, the difficulty will be still greater." This statement of the law was approved by the Supreme Court of New Jersey, in the case of *Eaton* v. *Eaton,* 37 N. J. Law, 108 (18 Am. Dec. 716), with the qualification that such is the law where fraud is practiced upon one who is known at the time to be insane, but not where the purchase and conveyance are made in good faith for a good consideration, and without knowledge of insanity. Here there is a charge of fraud accompanied by allegations of facts from which knowledge by the grantee of the alleged incompetency of the grantor is necessarily inferred, and therefore the plaintiff is not bound to allege what was the consideration and offer to return it.

2. Generally the presumption of sanity prevails, and the burden of proof rests upon one who asserts the contrary; but the appointment of a guardian of a person alleged to be *non compos mentis* by a court having jurisdiction, must necessarily create a presumption of the mental infirmity of the ward (*Ames' Will,* 40 Or. 495: 67 Pac. 737), which will prevail for at least a reasonable time thereafter.

3. There can be no doubt, however, of the general principle that the adjudication by itself cannot relate to a prior time as evidence of incapacity (22 Cyc. 1133), but, when it is shown that the mental condition of the ward had been the same for a considerable length of time, and was the same at the time of the act to be affected by it as when the adjudication was had, the adjudication is competent evidence of previous insanity (*Small* v. *Champeny,* 102 Wis. 61: 78 N. W. 407; *Terry* v. *Buffington,* 11 Ga. 337: 56 Am. Dec. 423). And in a

case where mental weakness and incapacity are the con-
comitants of old age, and have been gradual and contin-
uous for a considerable time, and not the result of any
recent or intervening cause, but of gradual and natural
decay, such evidence is competent to show that the con-
ditions have not changed, but were the same as when the
adjudication was had: *Giles* v. *Hodge,* 74 Wis. 360 (43
N. W. 163).

4. In the present case the deed in question was exe-
cuted on January 8, 1906, when plaintiff was confined to
her bed, suffering from a serious and dangerous illness.
The subject-matter of the conveyance is her home and
practically all of her worldly possessions.   The adjudi-
cation of her incompetency took place 10 days thereafter
and when she had so far recovered from her illness as to
be around, and was in about the same condition of health
that she had enjoyed for more than one year prior
thereto.   She is about 70 years of age, and there is
abundant evidence in the record showing that for some
time prior to the execution of the deed she was suffering
mental and physical decline.   Under this state of the
record, the admission in the answer of the adjudication
by the county court on the 18th of January that plaintiff
was an incompetent person, shifts the burden upon de-
fendant to show plaintiff's competency at the execution
of the deed, and to free the transaction from any sus-
picion or implication of fraud practiced by her in pro-
curing its execution, and this she has not succeeded in
doing.

5. From a careful consideration of the whole record,
we are bound to say that plaintiff at the time of the ex-
ecution of the deed was not mentally competent to com-
prehend the nature or effect of the transaction.   She was
about 70 years of age, ignorant and unable to read or
write.   The property in question was purchased in Oc-
tober, 1904, by plaintiff and Joseph Schindler, her hus-
band, for the sum of $2,500, and was conveyed to them

jointly. They went upon it and made it their home. In the following April, Joseph died, leaving to plaintiff, besides the home, a small amount of personalty. The estate was administered upon by John T. Long, as administrator, who was also plaintiff's legal advisor, and at the settlement about $400 in money was paid to her by the administrator as the residue thereof. This was some time prior to the execution of the deed, and Long testifies that at that time he had some misgivings as to her sanity, and hesitated some in paying over the money to her; that he consulted the county judge about the matter, and finally paid her the money, but that she did not seem to understand the nature and effect of the receipt she signed therefor. She had an only son, Ira South, now her guardian, but who lived in the vicinity of the City of Portland, several hundred miles distant, who came to see her infrequently. She was in declining health and subject to occasional spells of serious illness. In May, 1905, Mrs. Anna Watkins and her husband were engaged to make their home with plaintiff and care for her, they furnishing the table in payment of rent. They stayed with her until the middle of August. Mrs. Watkins testifies that plaintiff was no more than a child in her ways, doing irrational things, such as changing her medicine from one box to another, secreting perishable articles of food in her bedroom, and threatening to kill herself; that witness spoke about her to Dr. Hoover, plaintiff's physician, and he told her that plaintiff's mind was weak, and that she was not responsible for what she was doing, and must be watched. This witness nursed her through three periods of illness, which were so serious that at times she thought plaintiff would die, and she was of the opinion that plaintiff was not capable of attending to business at any time, and could not count money or make change. After Mrs. Watkins went away, plaintiff's neighbors looked after her and waited upon her when she was ill. Among them was Mrs. Caroline

Cordon, whose testimony is much to the same effect as that of Mrs. Watkins. Plaintiff became seriously ill again about January 6, 1906, but about two weeks previously either plaintiff, or some one of her friends for her, had secured the services of Anna Chaliou, a servant girl, to assist and take care of plaintiff. Defendant, a married woman and neighbor, with others, had bestowed a great deal of care and attention to assist in caring for plaintiff. Defendant says that her services at times were rendered at the request of plaintiff's husband, when he was living, and under the promise of compensation, but we are inclined to think that they must must have been rendered voluntarily and without any expectation of remuneration by her. She testifies that on January 6th she was called to wait on plaintiff, who was so ill that she could not leave her. She stayed with plaintiff that day, sat up with her the following night and for several succeeding nights, but on the evening of the 7th plaintiff was better. What occurred on that day between them is given by defendant in these words:

"I told her that I would have to go home with my children, and that the hired girl could watch her, and she says to me: 'No; don't you leave me for a moment. I would not trust myself with the girl or anybody else.' Mrs. Cordon had been there, and I told her that probably Mrs. Cordon would come and stay with her, and she says: 'No; I don't trust myself with Mrs. Cordon or anybody else. I want you to stay right here.' And I told her that I could not leave home to stay with her; * * that she was all right now and she could stay with the girl; * * that I would have to go and attend to my household duties, and she says: 'No; I want you. * * You have been good to me, and, if it had not been for you, I would have died long ago. Now,' she says, 'I will tell you what I will do, if you will bring your bed here tonight and stay with me, and be here in the morning, and give me my medicine and breakfast, and stay with me, I will give you this property.' She says: 'I have been intending to mention about the property.' I stopped and studied a minute, and

I says: 'Grandma, I don't believe you mean that.' And she says: 'Yes, I do.' She says: 'What is the difference in me spending money to have people to take care of me, or giving you the property to keep me and take care of me the rest of my days, and then I know I will have a woman to look after me the rest of my life, for my son does not take any interest in me.' Well, I studied a few minutes. I did not know really whether she meant it or not. After a while I says to her: 'Now, Grandma, if you want me to do that, you will have to make me a legal deed to the property,' to see whether she realized what a deed meant, and she says: 'I will. We will fix the thing so that never anybody could come between you and I, and I want you to take care of me the rest of my life, provide me with a home.' And I says: 'All right.' So then I went home and done my work, and when I came back I brought my bedding, and I stayed with her."

According to defendant's relation of the facts, this is the first time that matter was mentioned, and it was then about 5 o'clock in the evening of the 7th, that plaintiff was crying, and that witness told her she could not stay with her and take care of her without some compensation, which resulted in the above agreement. This recital by defendant convinces us of two things: First, that the defendant had secured complete control over the mind and affections of plaintiff; and, second, that defendant at the time doubted plaintiff's mental capacity to comprehend the effect of the proposed transaction.

Dr. Hoover, plaintiff's attending physician, testifies that he had several conversations with plaintiff about the advisability of her deeding her property to defendant, and advised her that it might be the best thing for her to do, but that it was none of his business, and to do just as she liked about it. But he also says:

"One evening I called there and Mrs. Cordon was in the room, and there seemed like there had been more or less roughness there all day" about her going into this deal. "She sent Mrs. Cordon out of the room, * * and, after she went out, she said: 'I have decided to take up the Parzoos at their offer, and I wish you would have

some good attorney come up here tomorrow and fix the necessary papers.' And I says: 'All right.' * * 'Now,' she says, when the woman left the room, 'I don't care if this woman know what I am doing. She thinks I am crazy. I wish she would go home and attend to her own business. I will have nothing to do with her.' "

From other witnesses it appears clear that the question of plaintiff's competency had been discussed among those who had been assisting in taking care of plaintiff, and that the defendant, no doubt, knew of that fact, and through her it was communicated to plaintiff, who became ill disposed towards them. We think, also, the inference is plainly deducible from her statements to Dr. Hoover that the defendant had made the proposition to plaintiff and had urged its acceptance. The following morning Charles L. Hamilton, an attorney, was procured to call upon plaintiff, and, learning her wishes, he returned to his office and prepared the deed. In the afternoon of the 8th he called again to have it executed. Defendant had procured the attendance of a Mrs. Perry, a neighbor, to act as a witness. Hamilton testifies that plaintiff then informed him, in the presence of defendant, that others thought that she was crazy, and he then informed her that, if that were true, he could not take her acknowledgment. But, after talking with her a few minutes, he concluded she understood what she was about to do, and, after having read the deed over to her, omitting the description, he asked her if she understood it, to which she answered she did. Then defendant and Hamilton raised and supported plaintiff in the bed and, while the latter held her hand, she made her mark in execution of the deed. As to what immediately followed in reference to the delivery of the deed, there is some conflict in the testimony. Defendant, however, testifies that it was first handed to plaintiff, who then handed it to her, with the remark that "what is mine is hers, and what is hers is mine." The consideration expressed in the deed is

for services theretofore rendered by the grantee in nursing and taking care of the grantor and services to be rendered by the grantee in nursing and taking care of the grantor and providing her with such a home during her life, as the circumstances and means of the grantee will permit. It appears, however, from the testimony of defendant, as well as from other witnesses, that previous to the arrangement between plaintiff and defendant, made on the 7th, as related by defendant, and which forms the express consideration of the deed, an offer had been made by defendant to plaintiff to exchange her timber claim in the mountains and her home place in Roseburg for plaintiff's property conveyed by this deed. Defendant says plaintiff first wished to sell to her; but, having no money with which to purchase, she offered this exchange. Mrs. Cordon says plaintiff told her of the offer, and she advised her strongly against the exchange, as it was greatly to her disadvantage. All this goes to show a continued and persistent effort by defendant to secure from plaintiff the title to this property now in controversy, and the remark above noted attributed to plaintiff by defendant, as having been made at the time of the delivery of the deed, induces us to believe that she did not at the time comprehend the nature of the transaction, or the terms upon which she was parting with the title to her home, but that she imagined or believed she was effecting an exchange. She has testified in her own behalf that she cannot remember anything about the agreement to convey to the defendant, as testified to by the latter, nor anything about the execution of the deed. She has no memory of Hamilton being there or John T. Long, who called later. And, when asked when was it she found that this deed had been made, she made answer: "A week or two after I begin to see devils and everything else after me. Some told me long ago I was in hell, a good while ago; but would not be-

lieve me." This, as well as other parts of her testimony, discloses a disordered mind. While Dr. Hoover testifies that she was in a normal mental condition for one of her age and was competent to transact business, and he is substantially corroborated by Mrs. Perry and Charles Hamilton, yet there is much other testimony in the record to the contrary supported by circumstantial detail of irrational acts done by plaintiff at the time and preceding the execution of the deed and for a considerable time previous thereto that we are bound to say from the whole record that she was not competent to execute the deed.

It is confessed by all who have testified that plaintiff had been suffering from frequent and serious illness, which threatened to terminate fatally; that such illness was accompanied by severe pains, to alleviate which her physician had habitually prescribed morphine; that she was so seriously ill on the 6th and 7th of January that it was necessary to attend upon her at night and for several nights thereafter, and by some of her attendants it was thought she would not recover. The prescriptions prepared by Dr. Hoover are in evidence, and contain morphine, although not in large doses, yet in sufficient quantity to alleviate her pain, and when that result had been attained she was said by defendant and the physician to be better, and then it was that the deed was executed. But we cannot fail to note that on the next day following the execution of the deed a new prescription was given in which the quantity of morphine was doubled. There is no explanation given for the necessity of this.

A great deal has been claimed by counsel for defendant for the apparent neglect of plaintiff by her son, who is now acting as her guardian and prosecuting this suit. As before stated, he lived in the vicinity of Portland, where his business kept him. But the record shows that he visited her in July, 1905, and that he had been en-

deavoring to provide a home for her in Portland with her relatives, where she could be cared for and near to him, and in this effort he had partly succeeded, but had been delayed in its consummation. He testifies, however, that he visited his mother in the spring or summer of 1905, and while there he arranged with Dr. Hoover to attend and administer to the needs of his mother, and that, if she became seriously ill at any time, to notify nim, and he would come. He was not advised of his mother's admitted serious illness on the 6th or 7th of January, and had no information of her situation, or of the execution of the deed, until after it had been accomplished, and then only by the advice of another than those bringing it about.

We are unable to find any reason upon which to base a reversal of the decree. On the contrary, every principle of equity supports it, and it should be affirmed, with costs to respondent in this court.      Affirmed.