148 Cal.App.2d 761 (1957)
Estate of HELEN ELIZABETH GILBERT, Deceased. RUBY STONE ANGELL et al., Appellants,
v.
THE TOWN OF WEST BROOKFIELD, MASSACHUSETTS et al., Respondents.
Civ. No. 21627. 
California Court of Appeals. Second Dist., Div. Three. 
Feb. 27, 1957.
 Maurice Norcop and Milo V. Olson for Appellants.
 Gibson, Dunn & Crutcher, Henry F. Prince, and Sherman Welpton, Jr., for Respondents.
 SHINN, P. J.
 By her will Helen Elizabeth Gilbert left all her large estate to Amherst College, the town of West Brookfield, Massachusetts, Massachusetts Institute of Technology, and Pomona College. It named Dr. James S. Montague executor and he proposed the will for probate. A contest was instituted by Ruby Stone Angell, Lucy Ruth Stone, Bessie Jane Stone and Dorothy White Gough who are first cousins of testatrix. The will was dated September 20, 1954, and Helen died September 29, 1954. The grounds of the contest were that the devises and bequests were invalid under section 41 of the Probate Code, in that the will was not executed at least 30 days before the death of Helen, and the further ground of incompetency.
 Trial was to a jury. After all the evidence was in, on motion duly made, the court directed a verdict in favor of the executor and the beneficiaries as proponents of the will. The contestants appeal. We shall refer to appellants as contestants and to the respondents as proponents.
 We shall consider first the contention of appellants that there was sufficient evidence to support a finding of incompetency. *764
 Contestants introduced the testimony of 15 witnesses, proponents, the testimony of 11 witnesses. The resume of the testimony introduced on behalf of contestants occupies 70 pages of their opening brief. The proponents' resume occupies 46 pages of their brief. It covers the same ground as the statement of the contestants and adds some of the evidence introduced by proponents.
 We shall give what we consider to be somewhat more than an adequate summary of contestants' evidence. At the time of her death Helen was 47 years of age. The family had consisted of her mother and father and her brother Philip, some two years her senior, who had been born while the family was living in Massachusetts. In April 1916 the Gilberts and their children were living in California. Helen was then about 9 and Philip about 11. Helen was described as a "bubbly, vivacious youngster with beautiful dimples." The two children, while playing on the beach, were buried in a cave-in; Helen was rescued but Philip perished. Within a few months thereafter a change took place in Helen's manner; she became quite melancholy. She was educated in the grammar schools, Berkeley Hall School, Los Angeles High School, Barnard, Columbia, UCLA and the University of California at Berkeley. After her college days she spent a couple of years in London away from the family. Between the years 1934, when she was about 27 years of age, and 1950, she lived alone in New York; she was unemployed except for about two weeks when she worked in a bookstore. She was morose, uncommunicative and disinclined to develop friendships. She would answer questions in monosyllables, would sometimes stare at people with a childlike expression and developed a habit of rolling her eyes and partially closing them. The witnesses testified to many incidents in which Helen's conduct was strange. When visiting in the East and invited out to dinner she complained bitterly of having to get up at 7 in the morning and traveling to another city for Christmas dinner, saying that she was not used to getting up until after noon. When she was about 18 years of age she failed to make an appearance on two occasions when she was invited to the opera and the theatre. She quarreled with her mother and upon one occasion packed a suitcase and threatened to leave. A former neighbor, who lived next door to the Gilberts, testified to having heard Helen quarrel with her father, telling him she hated him and that she heard the sound of scuffling in the Gilbert house. In 1929 the Gilberts *765 went to Europe and the following year Mr. Gilbert passed away. Helen's mother died in 1950 and Helen become possessed of an estate of more than a half million dollars. Prior to that time she had had no business experience or occupation and had subsisted upon remittances from her parents. In fact she never engaged in any activity that made demands upon her time other than to attend to her properties after she became possessed of them.
 Contestants produced evidence that shortly after her mother's death, when Helen was a dinner guest she suddenly asked to be taken home while dessert was being served. She was "very frantic looking, very wild looking." While being driven home she said nothing. She was trembling and highly nervous. Nearly all of proponents' witnesses testified to her extreme nervousness. At about the time of the dinner incident Helen promised Mrs. Swift a trip to Europe or South America, but she became displeased with a travel agent they consulted and said nothing more to Mrs. Swift about the trip. She wore her hair combed straight back which the witnesses who commented upon it designated as stringy and slightly unkempt. She dressed plainly; some thought in an untidy manner; others that her clothing was good and not in bad taste. She cared nothing for young men and had but few friends, with none of whom was she intimate. In 1949 she had aged perceptively, her face was lined and her complexion sallow. While she was living in New York in 1940 she said she had no friends; that she slept during the day and went out about 11 o'clock at night to some bar to talk to bartenders, who were the only friends she had; she did not sleep well and said she took 10 or 15 aspirin tablets at night. She left her clothing in disarray about her bedroom. On one occasion when taken out to dinner she had drinks and smoked but ate nothing and said her physician had told her she would have to stop drinking and smoking if she wanted to live longer.
 In January 1950, when Helen was in New York, her mother became seriously ill; Mrs. Bridenbecker, a nurse, called Helen to tell of her mother's illness; Helen requested that good doctors be obtained for her and asked to be called every night as to her mother's condition, which was done. Her mother passed away the middle of February. Helen was very much upset because she had not be advised of the serious condition of her mother. She authorized Mrs. Bridenbecker to make the funeral arrangements. Helen came on from New York the day preceding the mother's funeral and met Mrs. Bridenbecker *766 at the Gilbert apartment. She complained bitterly of the condition of the apartment. After the funeral there was an unpleasant incident concerning the disposition of Mrs. Gilbert's personal belongings and a wheelchair that was in the apartment. Mrs. Bridenbecker testified that Helen became angry and said that for two cents she would throw Mrs. Bridenbecker out of the window and she scratched her arm. About a week later Mrs. Bridenbecker saw her on the street and Helen ran across the street and crouched down behind an automobile. She seemed frightened. Shortly afterwards there was a similar incident. She would hold her hands up in the air and clench her fists. Another witness, Mrs. Davitt, testified she had met Helen in London in 1930 where Helen had been for two or three years, and she also met her in Paris. This witness also testified that in 1932 when she and her then fiance, Dr. Davitt, called at Mrs. Gilbert's apartment to take Helen and her mother out to dinner, Helen came into the room nude; her mother remonstrated with her; Helen threw a heavy book at her mother, knocked her over a chair, returned to her room and decided not to go to dinner. A few days after Mrs. Gilbert's death Mrs. Davitt visited Helen for about an hour; Helen looked untidy, was drinking and extremely nervous. After Helen took over the apartment she decorated it by hand. She pasted a piece of fern on the refrigerator door, covered it with clear nail polish and tinted it green in order to cover up a crack. She painted the window sills of the breakfast room, the refrigerator, inside and out, and decorated them with pearls and other ornaments from a dime store. Helen thought it was all very beautiful. In those days she would drink either a highball or some imported liquor. A witness named Lavine who ran a grocery and liquor store sold Helen liquor for about 19 months previous to August 1952. She bought expensive imported liquors, including Yugoslavian and Serbian Slivovitz. Her purchases cost from $5.00 to $9.00 per bottle. Helen's dress seemed completely out of pattern to this witness and she did not appear to him to be an up-to-date-looking woman. Helen had trouble with her landlady, Mrs. White. She continually complained that her apartment was neglected, she would deduct $10 from her rent check and when she did not pay her rent on time, Mrs. White would give her a three days' notice to quit. The owner of the apartment house brought suit and obtained a judgment for Helen's eviction from the apartment. She was greatly distressed *767 over her threatened eviction, which was to be enforced about the 27th day of September, 1954. With two friends she had made some effort to find another apartment, but did not seem interested.
 Seven of the witnesses of contestants who testified to one or more of the incidents above mentioned expressed opinions that Helen was irrational and of unsound mind, based upon her physical appearance, actions, statements and mannerisms which they had described.
 There was ample evidence that Helen led a most unhappy home life, due principally to absence of congeniality between herself and her mother. She preferred to live alone. She was lonely, morose, not sociably inclined, wilful, and given to exhibitions and conduct which was erratic and eccentric. It was such conduct as we have mentioned that led the several witnesses to their opinions that Helen's conduct was irrational and that she was of unsound mind. She was, as we have said, extremely distressed over the impending eviction from her apartment. She was due to leave it September 27th. When a friend, Ruth Billheimer, called her on that day and got no response, she telephoned the manager of the apartment. Helen was found in her apartment, lying on the floor unconscious. Beside her was a note in her handwriting "To whom it may concern. I have taken luminal. Helen Gilbert." She was taken to the hospital where she passed away on the second day without regaining consciousness. Contestants did not undertake to prove the cause of the death but it is immaterial whether it was a suicide, inasmuch as the circumstances indicated an attempted suicide. The foregoing constitutes the substance of the evidence upon which contestants relied and now rely as sufficient to require that the issue of competency be submitted to the jury.
 At this point we may mention familiar rules of law to which the facts must be applied. [1] Helen Gilbert was competent to make a will if she had mental capacity to be able to understand the nature of the act she was doing and to understand and recollect the nature and extent of her property and to be able to remember and understand her relation to the persons who were the natural objects of her bounty. (Estate of Sexton, 199 Cal. 759 [251 P. 778]; Estate of Smith, 200 Cal. 152 [252 P. 325]; Estate of Arnold, 16 Cal.2d 573 [107 P.2d 25]; Estate of Lingenfelter, 38 Cal.2d 571 [241 P.2d 990].)
 [2] The rule applicable to rulings upon motions for a *768 directed verdict is stated in the brief of contestants as a quotation from Estate of Flood, 217 Cal. 763, 768 [21 P.2d 579]: " 'It has become the established law of this state that the power of the court to direct a verdict is absolutely the same as the power of the court to grant a nonsuit. A nonsuit or a directed verdict may be granted "only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given." ' "
 Contestants earnestly argue that the testimony as to Helen's eccentricities was sufficient to establish prima facie a mental deficiency in all the particulars enumerated. In other words they contend that it constituted substantial evidence that Helen was unable to understand the nature of her act in making a will, that she did not know what property she owned or its value, and that she did not understand her relation to the persons who were the natural objects of her bounty. Without discussing the value of the opinion evidence, standing alone, we shall assume purely for the purpose of discussing the point, that it could have been inferred from the evidence of the peculiarities of conduct which Helen exhibited that she was so bereft of reason as to be wholly lacking in testamentary capacity. Even upon this assumption it is clear that any such inference was effectually dispelled by other evidence of the contestants to which we shall refer. The witnesses for contestants did not testify that Helen was lacking in mental capacity, the ability to reason or to remember. They did not testify that she ever suffered from any delusion or hallucination or that her mental faculties were failing. With respect to those matters there was other evidence of contestants which was direct and, we think, conclusive.
 [3] A rule applicable to directed verdicts was stated by the Supreme Court in Leonard v. Watsonville Community Hosp., 47 Cal.2d 509, 515 [305 P.2d 36], as follows: "It is settled that where the evidence raises an inference that a fact exists, and either party produces evidence of the nonexistence of the fact that is clear, positive, uncontradicted and of such a nature that it cannot rationally be disbelieved, the nonexistence of the fact is established as a matter of law. (See Blank v. Coffin, 20 Cal.2d 457, 461 [126 P.2d 868].) *769 In these circumstances the inference is dispelled as a matter of law, and, if the fact inferred is necessary to establish an essential element of the plaintiff's case, a nonsuit or directed verdict is proper. (Engstrom v. Auburn Auto. Sales Corp., 11 Cal.2d 64 [77 P.2d 1059] [directed verdict]; Crouch v. Gilmore Oil Co., Ltd., 5 Cal.2d 330 [54 P.2d 709] [nonsuit]; Ceranski v. Muensch, 60 Cal.App.2d 751 [141 P.2d 750] [directed verdict]; Johnston v. Black Co., 33 Cal.App.2d 363 [91 P.2d 921] [insufficiency of evidence].)" [4] The evidence referred to above, consisting of the opinions of witnesses as to Helen's incompetency and the reasons for their opinions, did not touch directly upon the factors which are controlling as to Helen's possession of testamentary capacity. None of those witnesses testified to any discussion with her concerning the property she owned with the exception of the witnesses Geraldine Congdon and Marion Luenberger. Mrs. Congdon testified that when she learned that Helen was having trouble with the manager of her apartment she asked her if she was in financial difficulties and Helen replied "Oh, no, I have more money than I know what to do with." Mrs. Luenberger, a friend of long standing, testified that she told Helen that with all her money she could go many places and do many things and Helen replied "No, the money came too late. I am past forty and I can't use this money when I am past forty. I should have had it when I was twenty-five and I am not interested in it and I don't want to go anyplace and I want to stay right here." No witness testified that Helen ever drank immoderately.
 One of contestants' witnesses was Ruth Billheimer, society editor for many years of the Pasadena Star News. She and her family had been friends of the Gilberts since she and Helen were small children. Under subpoena of contestants, Ruth produced a series of writings she had received from Helen. In the early part of September 1954, Helen had asked Ruth to render certain services for her in the event of her death, and Ruth accepted. She received a letter from Helen dated September 26, 1954. Upon Helen's death other writings were found which Dr. Montague had been requested to hand to Ruth. There was sheet of paper containing the names and address of six women friends and a listing of items of personal property they were to receive from Ruth Billheimer. Dorothy Gough was among those named. There was another writing indicating that the town of West Brookfield, Massachusetts was to receive books and other objects. *770 There was a note, evidently intended for Dr. Montague, respecting tenants of Helen's buildings, stating that rent bills should be sent to them but no receipts, that the tenants were responsible for all repairs, window glass, plumbing, and painting, owner only for exterior walls and roof. There was a memorandum expressing the wish that Mr. Hitchcock of Bodkin, Breslin and Luddy, handle the probate of Helen's estate. All the foregoing were in Helen's handwriting. Also in evidence was a copy of a letter in Helen's handwriting addressed to Amherst College. There was a letter to Mr. Hitchcock, expressing a desire that he act temporarily in handling estate affairs until the firm of O'Melveny and Myers should take over and a letter to Mr. O'Melveny who had handled the estate of Helen's father, requesting them to handle her own estate. There were two other letters addressed to Dr. Montague.
 Helen owned nine commercial rental properties in Los Angeles. Ruth Billheimer testified that Helen dictated to her and she typed for her the legal description of these several properties. She also mentioned to Ruth the names of her cousins who are the contestants. She said that she had rarely seen them, had had nothing to do with them, did not feel any responsibility toward them and did not wish to remember them in her will.
 At Helen's request Ruth arranged for Mr. Hitchcock to see Helen about the preparation of a will. She was present when the draft of the will was read to Helen by Mr. Hitchcock. Helen made changes in it. She asked Mr. Hitchcock to eliminate the disinheriting clause. She discussed every provision of the will and saw to it that they met with her wishes. In her letters to Ruth, Helen expressed her thanks for Christmas presents she had received on two occasions. The letters were warmly affectionate and were expressive of Helen's appreciation of kindness and friendship. One of the letters evidenced her knowledge of the properties which she possessed, spoke of her dealings with real estate agents, with her tenants, rentals and repairs, mentioned the fact that buildings her father had constructed while "neither impressive nor particularly attractive ... were simple, functional and durable buildings." In a letter dated September 19, 1954, which Dr. Montague handed to Ruth, Helen expressed a desire for the cremation of her body with "no funeral service, no obituary notice, and no embalming. No stone of any sort is to be erected to my memory." With the letter were $300 in cash *771 and a cashier's check payable to Ruth for $4,000. The money was directed to be used for funeral expenses, for the shipment of personal effects to the people listed and what was left over Helen requested Ruth to spend for herself "for something--a trip--a car--a fur coat--that will give her pleasure." Helen wrote to Ruth again September 26th. The letter spoke of Helen's pleasure at being with Ruth the past week. It spoke of the probate of her mother's estate as something of an ordeal and her distress at her impending eviction from her apartment. The letter indicated that Helen might be contemplating suicide. It expressed the hope that the request she was making of Ruth would not be too much of an ordeal and it stated that Dr. Montague had another letter giving further instructions. It ended "many, many thanks and much love, Helen." There was a letter to Dr. Montague, whom Helen had known since childhood, calling attention to papers in a desk relating to Mrs. Gilbert's estate which might be helpful. He was requested to confer with Amherst College officials and urge them to accept a gift proposal for a magazine. Of her estate she said "It came to me much too late to give me any pleasure. Rather it has been a source of added unhappiness and down-right misery. I would like to believe that it will be used for the project I planned, and at Amherst, since that was Father's college and it is really his estate." The letter expressed her gratitude to Dr. Montague for his being willing to assist her. It stated that she had pointed out to him the things she wished sent to West Brookfield. It stated "I am very tired. I have been so isolated that death has seemed to present terrible problems and you and Ruth have helped me overcome the obstacles in the way. Most affectionately, Helen." In another letter to Dr. Montague, dated September 25th, Helen wrote at length concerning the rental of her properties, the monthly check she received from the Mutual Life Insurance Company and interest on United State Savings Bonds. She spoke of the painting of one of her properties, the cost of hauling away rubbish from another one, arrangements made for the replacement of broken window panes and straightening frame work and the necessity for some metal work. She spoke of a high insurance rate on one of the properties and the fact that she was always notified when insurance policies were about to expire. The letter stated that all the roofs of the properties save one were in good repair and that the Owen Roofing Company would always make an inspection without charge. She had *772 inspected one of her buildings the previous Monday. Three parcels of property had been sold and there remained only nine rental properties. She suggested the name of an accountant who had handled her income tax returns. Helen spoke of a check for $500 in favor of Gene Chamberlain and that if it could not be delivered to her that if it was possible "I should like to apply it to some fund to provide that all heirs at law and all executors be given a pamphlet of simple instructions at the 1st Probate Hearing outlining the legal procedure involved--such as--right to choose a lawyer--right to protest a co-executor--basic facts about appraisals--basic facts about pro-rated fees of attorneys & executors. It's certainly needed." The letter stated "The money was kept for its own sake far too long--it has never really seemed to belong to me and I have had little use of it, though many troubles and problems in connection with it, not the least being the problem of how to leave it."
 There was a letter dated September 22d to Amherst College. It stated, in part, "Because this is fundamentally my father's estate, I wish this gift to go to Amherst. But it has been mine legally for a brief time and I feel very strongly that the money would be far more wisely and usefully spent on a magazine than on scholarships. I believe that it is wiser to spend money and expend it on things of value rather than to guard and protect it as something of value in itself. There are so many scholarship funds and scholarships under the G.I. bill, that the need for them seems less than formerly." (The reference to the magazine was to the desirability of developing a short story magazine. Helen read many of these.)
 These were the letters of a highly intelligent woman with an active mind and an ability to do her own thinking. The letters were well composed and expressed Helen's wishes clearly and directly. They evidenced her knowledge of her rental properties and the income that she received from them and from other sources. They furnished convincing evidence that Helen suffered from no loss of memory or any approaching mental debility. Her mental processes were vigorous. The letters to Ruth Billheimer expressed her loneliness and her responsiveness to the friendship and kindness of one who was not related to her. She stated that the Christmas presents she received from Ruth were the only ones she had received. Even though she felt she had a duty to the memory of her father to leave the greater part of her estate to Amherst *773 College and to make bequests to other institutions, and her father's town of Brookfield, because she felt her wealth would thereby accomplish the most good, she nevertheless made a list of friends to whom she left small bequests as evidence that they had not been forgotten.
 From a consideration of the evidence of contestants, wholly apart from that of proponents, we are convinced that a verdict in favor of contestants would have been contrary to law, for the reason that there was no substantial evidence that testatrix lacked testamentary capacity.
 [5] Contestants assert as a separate ground of contest that they have a right to claim invalidity of the will because it was executed within 30 days preceding the death of Helen and the entire estate was left to charity. In order that they may contest the will upon this ground contestants must be within one of the classes to whom the right is limited by section 41, Probate Code, namely, "spouse, brother, sister, nephew, niece, descendant or ancestor" who would otherwise inherit.
 With respect to wills executed within 30 days of death the section as enacted in 1931 provided that all bequests and devises of property to "charitable or benevolent society or corporation, or to any person or persons in trust for charitable uses, unless done by will duly executed at least thirty days before the death of the testator" were void and the subject property would go to the "residuary legatees or devisees or heirs, according to law." The section was amended in 1937. By the amendment there was deleted the sentence "All dispositions of property made contrary hereto shall be void, and go to the residuary legatees or devisees or heirs, according to law." and there was added to the section the following: "All property bequeathed or devised contrary to the provisions of this section shall go to the spouse, brother, sister, nephew, niece, descendant or ancestor of the testator, if and to the extent that they would have taken said property as aforesaid but for such devises or legacies; otherwise the testator's estate shall go in accordance with his will and such devises and legacies shall be unaffected."
 Contestants assert that "first cousins are certainly collateral descendants or ancestors" because they and Helen had a common ancestor. Nothing could be more clear than that it was the intention of the Legislature, by the 1937 amendment, to grant the right of contest to those who are in the direct line of ascent or descent and to brothers, sisters, nephews and nieces who would be heirs of the testator and to exclude all *774 others who were not in the direct line of descent or ascent. Ruby Stone Angell, Lucy Ruth Stone and Bessie Jane Stone are full first cousins; Dorothy White Gough and Helen were maternal first cousins of the half blood.
 [6] Under the meaning of "descendant" and "ancestor" contended for by contestants, a brother, sister, nephew or niece of a decedent would be an ancestor; therefore, it is argued by contestants, Helen was their collateral ancestor. Giving this meaning to "ancestor" would render the naming of brothers, sisters, nephews and nieces in the 1937 amendment redundant and defeat the very purpose of the amendment. The intention was to recognize those in the direct line of descent or ascent as one class who would be entitled to object to charitable bequests and, as another class, brothers, sisters, nephews and nieces. (Estate of Cottrill, 65 Cal.App.2d 222 [150 P.2d 214].) Appellants contend that cousins were not mentioned in the latter class because they are included in the first. Their argument not only ignores the purpose of the 1937 amendment, which is expressed as clearly as the Legislature could have expressed it, but urges a construction which would do violence to elementary rules of statutory interpretation. In the enumerations of relatives who are neither descendants nor ancestors, those who were not included must be deemed to have been intentionally excluded under the rule "expressio unius est exclusio alterius." (Jones v. Robertson, 79 Cal.App.2d 813, 816 [180 P.2d 929].) Cousins were omitted; and they must remain omitted and without right to object unless and until they are added by the Legislature to the class of brothers, sisters, nephews and nieces. (Code Civ. Proc., 1858; Estate of Bunn, 33 Cal.2d 897 [206 P.2d 635].) The words descendant and ancestor were intended to be given their commonly accepted definitions. Descendants are children, grandchildren and their children to the remotest degree. Ancestors are those who have preceded another in a direct line of ascent. (Bouvier's Law Dictionary, 8th ed., 1914; Blacks Law Dictionary, 4th ed., 1951; Jewell v. Jewell, 28 Cal. 232.) Contestants say that if the Legislature had used the words descendant and ancestor as applying only to those in the direct line of descent or ascent it would have designated them as lineal descendants and lineal ancestors. The argument is specious. Under the commonly accepted meaning of the words they would not include a brother, sister, nephew or niece. The Legislature understood this and therefore those relatives were mentioned as a separate class. *775 Cases cited by contestants from other jurisdictions in which the words ancestor and descendant have been given a broader meaning are not in point. The instant case involves only a question of construction of section 41 of the Probate Code in the light of its history. No benefit can be derived from a study of the decisions of other courts interpreting entirely different statutes, serving different purposes. The contention of contestants is untenable and does not merit further discussion.
 A further point is made that counsel for proponents improperly argued on their motion for a directed verdict certain facts to which their own witnesses had testified and thereby endeavored to impress upon the court the strength of their defense of the will. [7] It is not improper for counsel to contend, upon such a motion, that the evidence of the defense overcomes, as a matter of law, the case of the opposition, for, as stated in Kohn v. National Film Corp., 60 Cal.App. 112, 117 [212 P. 207], a verdict is properly directed for a defendant if a complete defense has been made out by uncontradicted evidence. Such an argument was not inappropriate in the present case. But the motion should have been granted upon the ground that contestants produced no substantial evidence of the incompetency of the testatrix and we assume it was granted upon that ground.
 The notice of appeal lists numerous orders and rulings of the trial court which are not appealable. All purported appeals other than the appeal from the judgment are dismissed; the judgment is affirmed.
 Wood (Parker), J., and Vallee, J., concurred.