[Civ. No. 23824.   Second Dist., Div. Two.   Sept. 29, 1959.]

Estate of LOUISA WOLF, Deceased.   HELEN M. GIBSON, Appellant, v. MARY QUEER et al., Respondents.

Paul S. Crouch for Appellant.

Newell & Chester, Bailey & McWhinney, Lech T. Niemo, Robert Newell and Rufus Bailey, for Respondents.

HERNDON, J. — Proponent, Helen M. Gibson, appeals from a judgment denying a petition to probate the purported holographic will of Louisa Wolf wherein said proponent was named as the sole beneficiary. The grounds of contest advanced by contestants, the heirs at law of decedent, included (1) lack of testamentary capacity, (2) lack of due execution, and (3) undue influence. Although the trial court found that the instrument, dated November 12, 1957, was entirely written, dated, and signed in decedent's handwriting, the court also found that she lacked testamentary capacity at the time said instrument was executed and that it was the product of undue influence.

On this appeal proponent argues that the findings as to lack of testamentary capacity and the existence of undue influence are unsupported by the evidence. We have examined the record in the light of the familiar rule (*Estate of Teel,* 25 Cal.2d 520, 526-527 [154 P.2d 384] ; *Estate of Moore,* 143 Cal.App.2d 64, 67 [300 P.2d 110] ; *Estate of Bould,* 135 Cal. App.2d 260, 263-264 [287 P.2d 8, 289 P.2d 15]) and have concluded that there is abundant evidence to support the finding that the decedent lacked testamentary capacity at the time in question.

Louisa Wolf died on January 7, 1958, in Los Angeles, California. At the time of her death she was approximately 85 years old. Mrs. Wolf was a widow, her husband having predeceased her in 1946. After her husband's death she lived alone at her home at 4938 Meridian Street in Los Angeles. She had no children. Contestants Thomas Queer and Mary S. Queer are children of her deceased brother. Contestants Jeannette Wolf Kletter and Manning Lebensart are the sister and nephew, respectively, of decedent's late husband.

Charles H. Curtis, a doctor of medicine, has been engaged in the general practice of medicine in Eagle Rock, a suburb of Los Angeles, for over 30 years. Dr. Curtis is not a psychiatrist, his primary field of practice being that of internal medicine, specializing in the treatment of older people. He first treated decedent professionally in 1953 and was retained as her physician from that date until December, 1957. Dr. Curtis saw decedent regularly every one or two weeks during those years except for a period from December, 1956, to May, 1957. He diagnosed decedent's physical ailments at the time she was under his treatment as arteriosclerosis, hypertension, and chronic myocarditis. He explained these terms as follows: "[A] chronic myocarditis is a weakening of the heart muscles caused by probably back pressure from her hypertension which is caused by the hardening of the arteries. Q. What is the meaning of arteriosclerosis? A. Hardening of the arteries. Q. What was generalized, Doctor, or was she suffering in any particular part of her body? A. Oh, I think your small arteries in the brain are affected more first."

In Dr. Curtis' opinion decedent had been mentally incompetent ever since 1953 when he first began to treat her. He testified that decedent had substantially lost the retentive powers of memory several years before her death and was unaware from one moment to the next what was happening. Decedent told him that she had no money, that her neighbors

stole money and tools from her, and that the medicines supplied by the druggist were poisonous. Mrs. Wolf had two dogs, and her arms were "chewed up and scratched" by them. Dr. Curtis testified that when he remonstrated with her about the condition of her arms, "[s]he just laughed about it and said that the dogs did it." The doctor testified that when he was discharged by decedent she told him that "she didn't have any money. . . ."

In the summer of 1957 Mrs. Wolf was in poor health and on September 3, 1957, two neighbors, Mrs. Merha and proponent Helen Gibson, went into the house and found her in a semiconscious state. Mrs. Gibson, a practical nurse, cared for and treated Mrs. Wolf and four days later she called Dr. Curtis. At about that time the doctor suggested that Mrs. Wolf was mentally incompetent and he proposed that proponent be appointed as Mrs. Wolf's guardian. Thereafter, on September 18, 1957, Mrs. Gibson filed a petition in the Superior Court of Los Angeles County seeking appointment as guardian of the person and estate of Mrs. Wolf. Meanwhile Mrs. Gibson assumed full charge of Mrs. Wolf, and under her physical care Mrs. Wolf's physical condition noticeably improved.

The petition for guardianship was vigorously opposed by certain of Mrs. Wolf's relatives, including certain of the contestants herein. Evidence was taken, and on November 26, 1957, the trial judge in the guardianship proceedings went to decedent's home and interviewed her. In the course of this interview (two weeks after the date of the instrument in question) decedent told him that she had no will. Although appellant was present and heard decedent tell the judge she had no will, appellant remained silent. On December 10, 1957, the judge announced his decision to appoint Mrs. Gibson as guardian of the person of Mrs. Wolf. Two days later Mrs. Gibson moved decedent across the street into her home and discharged Dr. Curtis. Mrs. Gibson engaged a Dr. Wendell Morgan, who treated Mrs. Wolf until her death, and who signed the death certificate.

The instrument in question was written while decedent was in the care of Mrs. Gibson. Mrs. Gibson testified that Mrs. Wolf gave her the paper and said "I want you to have this." Written in ink on a ledger page the instrument reads: "Nov 12 1957    I Mrs. Louisa Wolf leave all my real and personal property to Helen M Gibson. I have no Living relatives. I wish Helen Gibson to be Executor and Administrator

of all my Estate  Louisa Wolf I dont owe Mrs. Argo any money  Mrs. Knight any money either.''

During November, 1957, Mrs. Wolf was still under Dr. Curtis' care. He treated her on the 1st, the 11th (the day before the instrument was executed), the 18th and the 29th of November. Under questioning by the court, Dr. Curtis testified that during the period in question, Mrs. Wolf did not know the natural objects of her bounty, nor the nature and extent of her property. He testified that Mrs. Wolf lacked sufficient mental competency to dispose of her property in accordance with any rational plan.

Dr. Morgan signed the death certificate, which indicates that decedent suffered from ''generalized arteriosclerosis with senile dementia.'' He was not called as a witness by proponent.

The evidence above recited is more than adequate to sustain the finding that decedent lacked testamentary capacity at the time the purported holographic will was executed. ■ As stated in *Estate of Fosselman,* 48 Cal.2d 179, 185-186 [308 P.2d 336] : ''Testamentary incompetency on a given day, . . . may be proved by evidence of incompetency at times prior to and after the day in question. (*Estate of Perkins, supra,* 195 Cal. at 703 [235 P. 45] ; *Estate of Lingenfelter, supra,* 38 Cal.2d at 580 [241 P.2d 990] ; see *Vitale* v. *Vitale,* 147 Cal.App.2d 665, 669-670 [305 P.2d 690].) ■ Once it is shown that testamentary incompetency exists and that it is caused by a mental disorder of a general and continuous nature, the inference is reasonable (see *Estate of Baker,* 176 Cal. 430, 437-438 [168 P. 881] ; *Vitale* v. *Vitale, supra*), perhaps there is even a legal presumption (Code Civ. Proc., § 1963, subd. 32; see *Estate of Schwartz,* 67 Cal.App.2d 512, 521, 522 [155 P.2d 76] ; *Byrne* v. *Fulkerson,* 254 Mo. 97, 123 [162 S.W. 171] ; *Bever* v. *Spangler,* 93 Iowa 576, 601 [61 N.W. 1072]) that the incompetency continues to exist.''

■ We have noted that less than one month following the date of the purported will there was an adjudication that the decedent was an incompetent person. As stated in *Estate of Loveland,* 162 Cal. 595, 599 [123 P. 801] : '' [W]e have the adjudication of incompetency, following closely upon the execution of the will. There is no need to discuss appellants' claim that this adjudication was not conclusive on the question of . . . competency to make a will. The lower court did not assume to give it such effect. What it did was to admit such adjudication in evidence as showing that at the date of

the adjudication, Loveland was so far incompetent as to justify the appointment of a guardian. This may not establish the want of capacity sufficient for the making of a will (*Rice* v. *Rice,* 50 Mich. 448 [15 N.W. 545]), and of course could not fix the *status* of the person affected as incompetent to make a will on a date prior to that of the adjudication. But it is certainly evidence proper to be considered on the issue of want of testamentary capacity at the time of the appointment of the guardian. (*Ames* v. *Ames,* 40 Ore. 495 [67 P. 737]; *Chase* v. *Spencer,* 150 Mich. 99 [113 N.W. 578]; *Schindler* v. *Parzoo,* 52 Ore. 452 [97 P. 755]; *Small* v. *Champeny,* 102 Wis. 61 [78 N.W. 407]; *Terry* v. *Duffington,* 11 Ga. 337 [56 Am.Dec. 423].) And where there is testimony tending to show that the mental condition of the person has not changed between the date of the act in question and the appointment of a guardian, the appointment, although later in time, is admissible on the issue of capacity when the act was done." (See also *Estate of Jamison,* 41 Cal.2d 1, 13 [256 P.2d 984]; *Jensen* v. *Jensen,* 84 Cal.App.2d 754, 763-764 [192 P.2d 55].)

There was direct and circumstantial evidenec that decedent's mental condition had not materially changed in the interval between the execution of the purported holographic will and the appointment, less than a month later, of proponent as guardian of the person of decedent. Such an adjudication would not conclusively establish lack of testamentary capacity (*Estate of Jamison, supra,* 41 Cal.2d 1, 13; see *Estate of Worrall,* 53 Cal.App.2d 243, 247-248 [127 P.2d 593]), but it would constitute substantial evidence on which a finding of testamentary incapacity may rest. (*Cf. Estate of Krause,* 71 Cal.App.2d 719, 725 [163 P.2d 505].)

Moreover, wholly apart from the probative effect of the adjudication of decedent's incompetence in the guardianship proceeding, the testimony of Dr. Curtis abundantly supports the finding as to decedent's lack of testamentary capacity. ■ Evidence of Mrs. Wolf's ". . . appearance, conduct, habits and conversation, both before and after the execution of the will, were admissible so long as they had a reasonable tendency to indicate [her] mental condition at the time the will was executed." (*Estate of Luhr,* 138 Cal.App.2d 265, 268 [291 P.2d 555]; *Estate of Frank,* 102 Cal.App.2d 126, 130 [226 P.2d 767].)

■ As we recently stated in *Estate of Glass,* 165 Cal. App.2d 380, 383 [331 P.2d 1045] : "It is familiar law that a

testator is competent to make a will if he has sufficient mental capacity to understand the nature of the testamentary act, to understand and recollect the nature and situation of his property and to remember and understand his relations to the persons who are the natural objects of his bounty. (*Estate of Gilbert,* 148 Cal.App.2d 761, 767 [307 P.2d 395] ; *Estate of Sexton,* 199 Cal. 759, 764 [251 P. 778] ; *Estate of Smith,* 200 Cal. 152, 158 [252 P. 325] ; *Estate of Arnold,* 16 Cal.2d 573, 586 [107 P.2d 25].) ''

■ The testimony of Dr. Curtis is sufficient to support a finding of the absence of one or more of these elements of testamentary capacity. He did much more than indicate his belief that the decedent was of unsound mind in the medical sense. (See *Estate of Bourquin,* 161 Cal.App.2d 289, 298 [326 P.2d 604] ; *Estate of Bullock,* 140 Cal.App.2d 944, 948 [295 P.2d 954, 297 P.2d 633].) Dr. Curtis was intimately familiar with decedent's mental capacity and he was asked by the court whether Mrs. Wolf was capable of recalling the nature and extent of her estate, the natural objects of her bounty, and of understanding the nature of the act she was doing, at a time when Mrs. Wolf was still under his medical care. The doctor answered in the negative. The doctor was not testifying on the basis of a written medical history presented to him without the benefit of an observation of the patient. (See *Estate of Darilek,* 151 Cal.App.2d 322, 326 [311 P.2d 615].) His testimony was based on his personal observation of decedent for a number of years preceding her death. (See *Estate of Fosselman, supra,* 48 Cal.2d 179, 184.)

■ There being one clear sustained and sufficient finding upon which the judgment may rest, the sufficiency of the evidence to sustain other findings becomes immaterial. (*Logan* v. *Forster,* 114 Cal.App.2d 587, 602 [250 P.2d 730] ; *Spaulding* v. *Jones,* 117 Cal.App.2d 541, 554 [256 P.2d 637].) Hence, we need not consider the finding that the will was the product of undue influence.

The judgment is affirmed.

Fox, P. J., and Ashburn, J., concurred.