[Civ. No. 19196.   First Dist., Div. Two.   Sept. 21, 1961.]

Estate of WILLIAM WIRT WATSON, Deceased. JAMES L. WATSON, Respondent, v. CELIUS CHRISTENSEN et al., Appellants.

Harold D. Mefford for Appellants.

Harry Gonick and Robert P. Brorby for Respondent.

DRAPER, J.—In this will contest, the jury returned special verdicts finding that testator was without testamentary ca-

pacity and that his will was the product of undue influence. Proponents appeal from the judgment denying probate.

Testator was 80 years old at the time of execution of this will, one day before his death. His son, the contestant, was the only child of decedent. Although his parents had been divorced when he was five, he had maintained a close relationship with his father, spending school vacations with him, and, after his own marriage, visited the father frequently.

In 1948, the father purchased a home in Hayward. A substantial portion was rented, as separate apartments, to tenants. He lived alone in the remainder. The father had suffered from bleeding ulcers for many years, but did not complain of his health until the fall of 1957. There is evidence that at that time he told his son: "My health is failing and my mind is going," and "I am afraid that I can't take care of myself physically or mentally much longer." Although he consulted doctors, he refused to accept their advice and continued self-administration of medicaments chosen by himself. He repeatedly urged his son and daughter-in-law to leave the home they leased in Lafayette, move to his home, and care for him there. The son finally agreed to do so, when the tenants had been given reasonable time to arrange to move. Shortly thereafter, father telephoned son late one evening to say he had "kicked the tenants out," and that the son must move in with him at once. The son did so in late May 1958. The father soon began to become periodically violent in manner and speech, threatened suicide frequently, and insisted that the son's wife must leave the home.

On June 11, 1958, the son consulted an attorney for aid in obtaining hospitalization for his father. He was referred to the District Attorney's office, and there signed a petition for commitment of the father as mentally ill. After observation in a local hospital, and on testimony of two psychiatrists, the father was found to be mentally ill and was committed to Stockton State Hospital. Like diagnosis was made by the staff there.

One of the two psychiatrists who testified at the commitment hearing, and a psychiatrist of the state hospital staff, who had examined the father there, both testified at trial of the will contest. They agreed that testator suffered from "chronic brain syndrome, associated with cerebral arteriosclerosis with psychotic reaction," on the date of his commitment June 16 and on September 17 at the state hospital. They agreed that this mental condition was irreversible, and that it continued

to the date of his execution of his will, November 4. Each also testified that testator suffered from delusional ideas of persecution by his son.

On July 17, 1958, the son was appointed guardian of the person and estate of his father. On October 21, the father was given a "leave of absence" from the state hospital, on condition that he have supervision. He was never discharged. He went to a rest home and arrangements were made for Mr. and Mrs. Oliver, former tenants, to occupy his home with him and care for him. He returned to his home, in their care, October 28. On November 3 he went to an attorney and gave direction for preparation of his will, disinheriting his son and grandson, leaving a specific bequest to a church and dividing the residue equally among seven persons, former tenants and neighbors (including the Olivers) none of whom were related to him. He executed this will at the attorney's office the next day, and died the day following, November 5, 1958. By a will drawn in 1942, decedent had left all his property to his son. In a codicil dated June 19, 1957, he had provided for a bequest to a church, but did not otherwise modify the provision for the son.

Proponents' sole contention is that the evidence is insufficient to sustain the special verdicts.

■■ In a will contest, as in other cases, the credibility and weight of the evidence is for the trier of fact, and if there is substantial evidence to sustain the verdict or findings, an appellate court will not interfere (*Estate of Teel*, 25 Cal.2d 520 [154 P.2d 384] ; *Estate of Lauth*, 180 Cal.App.2d 313, 317 [4 Cal.Rptr. 764] ; *Estate of Collin*, 150 Cal.App.2d 702, 711 [310 P.2d 663]).

■ Unsoundness of mind which will invalidate a will must be either "insanity of such broad character as to establish mental incompetency generally, or some specific and narrower form of insanity, under which the testator is the victim of some hallucination or delusion" (*Estate of Chevallier*, 159 Cal. 161, 168 [113 P. 130]). The word "insanity" has largely disappeared from the lexicon of the psychiatrist, and "psychosis" is the more modern substitute.

■ Here the only psychiatrists who testified agreed that decedent suffered from cerebral arteriosclerosis which had caused irreversible brain damage, resulting in psychotic reaction, and that this continued through the date of execution of the will in question. At the commitment hearing of June 16, testator was found to be mentally ill, and at the appointment

of the guardian July 17, he was judicially determined to be incompetent within the meaning of the Probate Code. While these determinations are not conclusive in the present proceeding, they may be considered (*Estate of Wolf*, 174 Cal.App.2d 144, 149 [344 P.2d 37]).

If the jury determined that decedent lacked testamentary capacity on the dates of these determinations, it was a reasonable inference that the condition continued to the date of execution of the will (*Estate of Fosselman*, 48 Cal.2d 179, 186 [308 P.2d 336] ; and see *Estate of Wolf, supra,* 174 Cal.App. 2d 144, 148).

Proponents rely strongly upon the decision in *Estate of Alegria*, 87 Cal.App.2d 645 [197 P.2d 571], which points up the quantum of evidence required to establish that a will stems from an insane delusion of the testator. We agree fully with the definition of insane delusion there given, requiring that such a delusion be the product of a disordered mind, and that it be one which cannot be accounted for upon any reasonable hypothesis. Proponents argue that the claimed delusion of testator that his son had him hospitalized in order to take testator's property had some possible basis, and therefore could not be an insane delusion within the holding of *Alegria*. There is much evidence that testator's belief was wholly delusional, but it is unnecessary to summarize it here, since *Alegria* is clearly distinguishable from the case at bar. There the parties agreed that the sole issue was whether testatrix had an insane delusion that her son had attacked her, and there was no contention whatever that she was "of unsound mind in any general sense" (p. 648). In the case at bar, there is a definite and well-supported claim that testator was of unsound mind in a general sense. Two court determinations and the testimony of two qualified psychiatrists support the jury's implied finding of such mental illness. Since the case does not turn solely on the issue of insane delusion, the language of *Alegria* is not applicable here. Other decisions relied upon by proponents are similarly distinguishable. In those decisions (*Estate of Lingenfelter*, 38 Cal.2d 571 [241 P.2d 990], and cases there cited), contestants relied upon "isolated acts, foibles, idiosyncrasies, . . . or departures from the normal," to establish an incapacity first urged after death of the testator. Here his mental illness was medically and judicially determined during his lifetime and but shortly before his execution of the questioned will.

We conclude that the evidence amply supports the verdict finding testator to be of unsound mind when the will was executed. Thus it is unnecessary to consider the issue of undue influence.

Judgment affirmed.

Kaufman, P. J., and Shoemaker, J., concurred.

A petition for a rehearing was denied October 20, 1961, and appellants' petition for a hearing by the Supreme Court was denied November 15, 1961.