[Civ. No. 23206.   Second Dist., Div. Two.   Nov. 20, 1958.]

Estate of LOUIS R. GLASS, Deceased.   ROBERT M. SEGALL et al., Respondents, v. ESTHER GLASS ZIPKIN, Appellant.

Wolver & Wolver and Eugene L. Wolver for Appellant.

Eric Julber and William S. Bartman for Respondents.

HERNDON, J.—Contestant appeals from an order admitting to probate an instrument which the trial court found to be a valid holographic will. The appeal is presented upon a settled statement. Contestant is the sole surviving sister and proponents are a niece and two nephews of the decedent. The grounds of contest were : (1) lack of testamentary capacity; (2) lack of testamentary intent; (3) fraud; and (4) undue influence. The latter two grounds were abandoned at the trial.

It has been stipulated that the instrument in question is entirely in the handwriting of the decedent. As admitted to probate, it reads as follows:

"1956    May 10

This is Louis R. Glass

I wish to Retract my last Will witch I left my sister Ester Glass now Mrss Zipkin & give my belonges to my Three Nefeu

& Nice. Name is Bob Segal & Richard Glass. Mrs. Goldstien wich now lives in Santa Monica, Calif all three live here at Present I have $30,000 that wood leve them about 10,000 each & my cash in bankes in town in Los Angeles, Calif.''

On this appeal contestant argues three contentions: (1) that the trial court's finding of testamentary capacity is unsupported by the evidence; (2) that the purported holographic will bears no signature and (3) that ''no testamentary intent was proven in regard to the same.''

Decedent, who died on June 11, 1957, at the age of about 62 years, was a tailor by trade and a veteran of World War I. Records of the Veterans Administration received in evidence disclose that in 1931 he applied for and received a pension on the ground that ''nervous trouble'' prevented his further pursuit of his occupation. The original diagnosis of the examining doctor made in 1931 was ''Constitutional Psychopathic Inferior. Psychoneuosis [sic] mixed. Psychasthema and Hysteria.'' Later in the same year another doctor made a diagnosis of functional neurosis and mild psychosis. In 1933 a Veterans Administration examiner diagnosed decedent's conditions as ''psycho-neurosis mixed type.'' In 1939 and 1942 decedent was examined with resultant diagnoses of ''dementia praecox, catatonic type.'' The record discloses no further medical examinations during the 15-year period from 1942 until decedent's death in 1957.

In 1939 the Veterans Administration awarded decedent the maximum pension of $187 per month, which he continued to receive until his death. The decedent was never adjudicated an incompetent, nor was he ever hospitalized for any nervous condition. An attorney for the Veterans Administration testified that the pension payments were paid directly to decedent since he was always considered able to handle his own money.

Several relatives and intimate friends of the decedent testified to the effect that for many years after he began receiving his pension he spent much of his time at Pershing Square, at the local race tracks and at the stock exchange, where he gambled and invested, respectively, with a considerable degree of success. He lived frugally, spent very little money on himself and at one point invested in and operated a manufacturing business, making a substantial profit. At the time of his death, his estate consisted of some $30,000 in cash, which apparently represented accumulations from his pension, his gambling activities and his investments.

It is recited in the settled statement that "There was testimony that [decedent] remained vigorous and continued to do exercises until the time of his death, and there was no evidence of any deterioration of his physical or mental faculties during the last three or four years prior to his death. The death certificate of the deceased showed a Coroner's diagnosis of arteriosclerosis." There was testimony that decedent was quite active up until the time of his death and that he visited frequently with the niece and nephews named in the instrument in question. There was testimony also that it was the habit of decedent to refer to Maxine Levine as "Mrs. Goldstein." According to the testimony of Robert Segall, decedent had informed Segall before his death that his property consisted of approximately $30,000 in cash deposited in several banks which he identified, and he declared to Segall his intention to leave his money to his niece and nephews. After decedent's death, Segall found the questioned instrument in the top drawer of decedent's dresser folded with a prior witnessed will (referred to in the briefs as the will of July, 1955) in which contestant was named a one-third beneficiary and as executrix.

### Testamentary Capacity

From the foregoing recital, it is manifest that the evidence is amply sufficient to sustain the trial court's finding of testamentary capacity. ■ It is familiar law that a testator is competent to make a will if he has sufficient mental capacity to understand the nature of the testamentary act, to understand and recollect the nature and situation of his property and to remember and understand his relations to the persons who are the natural objects of his bounty. (*Estate of Gilbert,* 148 Cal.App.2d 761, 767 [307 P.2d 395]; *Estate of Sexton,* 199 Cal. 759, 764 [251 P. 778]; *Estate of Smith,* 200 Cal. 152, 158 [252 P. 325]; *Estate of Arnold,* 16 Cal.2d 573, 586 [107 P.2d 25].) ■ There is a presumption of sanity and to overcome this presumption ". . . the contestant must show affirmatively and by a preponderance of the evidence that the testator was of unsound mind at the time he executed his will." (*Estate of Lingenfelter,* 38 Cal.2d 571, 580 [241 P.2d 990]; *Estate of Smith, supra,* 200 Cal. 152, 158.) ■ Medical testimony to the effect that a testator suffered from mental illness is not conclusive on the issue of testamentary capacity. (*Estate of Jamison,* 41 Cal.2d 1, 13 [256 P.2d 984]; *Estate*

*of Bullock,* 140 Cal.App.2d 944, 948 [295 P.2d 954, 297 P.2d 633].) ■ Testamentary capacity cannot be destroyed by showing a few isolated facts, foibles, idiosyncrasies, moral or mental irregularities or departures from the normal unless they directly bear upon and have influenced the testamentary act. *(Estate of Lingenfelter, supra,* 38 Cal.2d 571, 581.) ■ "A contestant is required to prove testamentary incapacity at the very moment of the execution of the will. There is a presumption that a person is of sound mind at that very time." *(Estate of Darilek,* 151 Cal.App.2d 322, 327 [311 P.2d 615]; *cf. Estate of Greenhill,* 99 Cal.App.2d 155, 166 [221 P.2d 310].)

■ In the case at bar ". . . the will itself bears mute evidence of testator's competency" *(Estate of Bullock, supra,* 140 Cal.App.2d 944, 948; *Estate of Jamison,* 41 Cal.2d 1, 13 [256 P.2d 954, 297 P.2d 633]) in that the instrument mentions both the contestant and the proponents, correctly indicating their relationships to the author; it accurately recites the approximate amount and the location of the cash constituting his estate; it indicates an intent to revoke a former will and it expresses an intent to dispose of the property in such terms as rather clearly indicate an appreciation of the testamentary nature of his act.

### Sufficiency of Signature

■ A complete answer to appellant's contention regarding the sufficiency of the signature is to be found in *Estate of Bloch,* 39 Cal.2d 570 [248 P.2d 21], which states the applicable rules and cites the controlling precedents. As there stated (at pp. 572-573): "It is settled in California that the signature need not be located at the end but may appear in another part of the document, provided the testator wrote his name there with the intention of authenticating or executing the instrument as his will. [Citations.] ■ The required intention must appear on the face of the document itself, and parol evidence is not admissible to show that a signature found elsewhere than at the end is a signature of execution. [Citations.]"

A comparison of the instrument at bar with those involved in *Estate of Bloch, supra,* and in the several cases there cited and discussed will demonstrate the reasonableness and the correctness of the trial court's finding that decedent wrote his name upon the instant document "with the intention of authenticating or executing the instrument as his will."

### Testamentary Intent

■ "No particular words are necessary to show a testamentary intent but it must satisfactorily appear from the document offered as the last will and testament that the decedent intended, by the very paper itself, to make a disposition of his property after his death in favor of the party claiming thereunder." (*Estate of Wunderle,* 30 Cal.2d 274, 280-281 [181 P.2d 874] ; *Estate of Wallace,* 100 Cal.App.2d 237, 239 [223 P.2d 284].)

■ The instrument involved in the present case clearly discloses a testamentary intent. It constitutes a complete testamentary document under the decisions cited in *Estate of Wunderle,* and *Estate of Wallace, supra.* The writing on its face indicates that the testator did everything that he intended to do. An additional circumstance supporting the inference that the document was intended as a will is the fact that it was left folded with the former witnessed will which evidently was the instrument which the holographic will was intended to revoke. (See *Estate of Beffa,* 54 Cal.App. 186 [201 P. 616].)

Affirmed.

Fox, P. J., and Ashburn, J., concurred.