[Civ. No. 21574. First Dist., Div. One. May 5, 1964.]

Estate of CARL NORMAN NELSON, Deceased. LORRAINE NELSON, Petitioner and Respondent, v. EVELYN KING, Contestant and Appellant.

45

Vincent Hallinan, Carl B. Shapiro and Patrick Sarsfield Hallinan for Contestant and Appellant.

Jacob L. Karesh and Ollie M. Marie-Victoire for Petitioner and Respondent.

BRAY, P. J.—Contestant in a will contest after probate appeals from summary judgment denying revocation of probate of will and dismissing the contest.

### QUESTION PRESENTED.

Were there triable issues of fact? This in turn requires determination of whether the mere fact that decedent had been committed to a state mental hospital and a guardian of his estate appointed, raised an issue of fact as to his capacity thereafter to make the will.

### RECORD.

After decedent Carl N. Nelson's death[1] a holographic will dated December 30, 1958, was admitted to probate. This will left decedent's entire estate to his wife, respondent Lorraine Nelson, who was appointed administratrix with the will

---

[1] The record fails to show the exact date of death. Appellant states it to be June 1962, respondent December 6, 1961. The exact date is not material to this proceeding.

annexed. Thereafter appellant, who is decedent's sister, filed contest and petition for revocation of probate of the will on the grounds (a) that decedent was not of sound and disposing mind; (b) that the will had been revoked by testator; (c) that the will was induced by the undue influence of respondent wife and by her promise to secure his release from Napa State Hospital if he made the will,[2] that respondent secreted the will from decedent who demanded its return, and further that she told decedent that he could not revoke it while in the hospital. Respondent answered the contest denying all of the above mentioned allegations and moved for summary judgment. The moving papers will be discussed hereinafter. The court found that there were no triable issues of fact and entered judgment accordingly.

### SUMMARY JUDGMENTS.

Before considering the affidavits it is well to review the principles applicable to a motion for summary judgment. Justice Molinari of this court in *Saporta* v. *Barbagelata* (1963) 220 Cal.App.2d 463, 467-469 [33 Cal.Rptr. 661], has summarized what are now recognized as the well-established rules applying to summary judgments: "The purpose of the summary judgment procedure is to discover, through the media of affidavits, whether the parties possess evidence which demands the analysis of trial. [Citations.] The object of the proceeding is to discover proof. [Citation.] The affidavits of the moving party are strictly construed and those of his opponent liberally construed. [Citations.] A summary judgment will stand if the supporting affidavits state facts sufficient to sustain a judgment and the counteraffidavits do not proffer competent and sufficient evidence to present a triable issue of fact. [Citations.] In making this determination the respective affidavits are tested by certain applicable rules. The affidavit of the moving party must satisfy three requirements: (1) It must contain facts sufficient to entitle the moving party to a judgment, i.e., facts establishing every element necessary to sustain a judgment in his favor; (2) such facts must be set forth with particularity, i.e., all requisite evidentiary facts must be stated, and not the ultimate facts or conclusions of law; and (3) the affiant must show that if sworn as a witness he can testify competently to the evidentiary facts contained in the affidavit. [Citations.] These

---

[2]As to this alleged promise appellant in her deposition hereinafter referred to, admitted that she had no information on this subject; that it was merely her "supposition."

requirements are applicable even though no counteraffidavit is filed, and also where the counteraffidavit is insufficient. [Citations.] The counteraffidavit in opposition to the motion for summary judgment, on the other hand, must meet the following requirements: (1) It must set forth facts with particularity; and (2) it must set forth facts within the personal knowledge of the affiant, to which, as the affidavit shall show affirmatively, the affiant can testify competently if called as a witness. [Citations.] In the light of the rule of liberal construction applicable to affidavits in opposition to the motion for summary judgment, our Supreme Court has held that the facts alleged in the affidavits of the party against whom the motion is made must be accepted as true, and with regard to the requirement that the facts must be set forth 'with particularity,' has stated 'that such affidavits to be sufficient need not necessarily be composed wholly of strictly evidentiary facts.' [Citations.] Accordingly, it has also been held that counteraffidavits may state ultimate facts and conclusions of law and need not be composed wholly of evidentiary facts. [Citations.] It should be noted, however, that the rule of liberal construction does not go so far as to permit of a counteraffidavit which merely repeats the allegations of the pleadings or which contains no evidentiary facts at all. [Citations.] It should also be noted that the use of depositions in support of, or in opposition to, a motion for summary judgment in conjunction with or in lieu of affidavits is proper. [Citation.]''

With these principles in mind we turn now to the record to determine whether there are any triable issues of fact in this case.

The notice of motion for summary judgment stated that the motion would be based, *inter alia,* on the transcript of proceedings before the court on July 30 and August 2, 1962,[3] upon certain depositions of appellant, and the declarations of Attorney Jacob L. Karesh and Lorraine Nelson. In opposition to the motion appellant filed the declaration of Attorney Carl B. Shapiro.

In the probate homestead proceeding hereinbefore mentioned, it appears that decedent and respondent were married February 21, 1949. Decedent was then about 50 years of age, his wife 22. In January 1958, respondent filed a divorce ac-

---

[3]These related to a proceeding in which the probate court adjudged a premarital settlement invalid and set aside to the widow as a probate homestead property which was held to be community property.

tion against decedent because of his excessive drinking and irrational behavior. Prior to that time decedent had been in several hospitals for alcoholism. The divorce action was ultimately dismissed (whether before or after decedent's commitment to Napa State Hospital does not appear). In October 1958, at the instigation of the district attorney, decedent was committed to that hospital. In November 1958, respondent was appointed guardian of his estate. Decedent remained in the hospital except for a visit to appellant from May to December 1960, and a visit in March 1961 for some unascertained period. During these visits, decedent was permitted to drink. Before his commitment appellant saw decedent only once or twice a year. Decedent was still under commitment at the time of his death.

The declaration[4] of Attorney Karesh stated that in the deposition of appellant taken on October 23, 1962, "When asked upon what facts her allegation of unsound mind was predicated, contestant stated that her only reason was that decedent was a patient in a mental hospital at the time of making the will....

"In a prior deposition taken August 9, 1961, in action No. 147603, contestant stated emphatically that the decedent was not in her opinion incompetent.... At that time, she was apparently contending that decedent was only physically ill....

"... When asked about the facts on which this ground of contest is predicated, contestant said that as far as she knew decedent did *not* revoke the will....

"... Contestant said she did not know whether or not decedent had confidence in his wife, Lorraine Nelson...; and she then admitted that her allegation of undue influence was based upon only supposition and that she had no personal knowledge about it.... Again, in reply to a question concerning the allegation that decedent did everything Lorraine Nelson suggested, contestant replied that she could not answer, but that she 'imagined' that he did, but she had no personal knowledge....

"In reply to a question concerning her allegation that Lorraine Nelson induced the execution of the will by a false representation, contestant admitted that it was just a supposition...." Appellant at no time denied making these statements nor stated in this proceeding that she would testify otherwise.

[4]All declarations used herein were made under penalty of perjury. (See Code Civ. Proc., § 2015.5.)

"Deponent further says, regarding contestant's allegation that deceased's sisters were the true bounty of deceased's affection, that such allegation is manifestly untrue because during the proceedings before this court on July 30, 1962, and August 2, 1962, the following testimony was elicited:

"*Edward Dienstag,* an attorney at law, testified that decedent had told him that he couldn't get along without his wife, Lorraine Nelson, and didn't want to lose her. .. ; and that decedent further told the witness that his wife, Lorraine, was doing a good job of managing the apartment house. . . .

"*J.W. Radill,* an attorney at law, testified that decedent had told him he was teaching his wife, Lorraine Nelson, to handle the apartment house because she would have to take over when he passed away. . . .

"*John P. O'Connell,* an attorney at law, testified that decedent had told him that he wanted to provide for his wife. . . ; that the witness had the impression that decedent treated the apartment building as 'their mutual property'; and that both decedent and Mrs. Nelson owned it. . . .

"*Daniel England,* an internal revenue department agent, said that decedent told him the principal purpose of acquiring the apartment house was to make provision for Lorraine Nelson . . . and that decedent's chief concern was to make adequate provision for his wife. . . .

"*Leonard Worthington,* an attorney, testified that decedent had at one time consulted him about drawing up a will leaving everything to Lorraine Nelson. . . ; and that decedent wanted to protect his wife, in spite of a separation. . . ."
Accompanying the declaration were extracts from the said deposition of appellant and from testimony of the other witnesses mentioned in Attorney Karesh's deposition which fully supported the attorney's characterizations of the statements.

Respondent's declaration was to the effect: "... that she never suggested to decedent that he make a will, nor did she induce or persuade him to do so; that she never made any representations to decedent with respect to the execution of the will and never conversed with him or advised him with respect to the disposition of his estate, nor did she make any suggestions or representations with respect to the manner of the disposition thereof; that an examination of the decedent's papers and personal effects failed to disclose the existence of any will other than the one admitted to probate, and

likewise failed to disclose any writing, codicil or other instrument revoking or purporting to revoke the will so admitted to probate.''

Respondent made a further declaration that ''(1) The will here being contested was handed to deponent by decedent after its making, but deponent at no time secreted it; (2) Decedent never at any time requested that deponent surrender the said will to him for the purpose of destruction or for any other purpose; (3) Deponent never at any time represented to decedent that she or anyone else had destroyed the will; (4) Deponent never represented to decedent that the will was no longer in existence; (5) Deponent did not tell decedent that he could not revoke or alter the said will as long as he was a patient in a mental hospital; (6) Decedent never appeared to be confused about the said will in the presence of deponent; (7) Decedent knew that he had executed a will and never expressed the belief that it had been destroyed.'' She also filed a declaration to the effect that the above mentioned facts were in her personal knowledge and that if sworn as a witness she could competently testify thereto and would testify that decedent was of sound and disposing mind at the time of making the will.

In opposition, appellant filed only the affidavit of Attorney Shapiro in which he stated that prior to decedent's death, he had visited decedent at the Napa State Hospital, at appellant's home, at decedent's home and at a rest home. He discussed the legal affairs of decedent extensively with him, including the pending petition to have him restored to competency. At no time did decedent ever mention the existence of the will subsequently produced, indicate that such a will had been executed or that he had knowledge of the execution of the will; that decedent was committed to Napa State Hospital about October 29, 1958, and the will was executed there approximately two months after commitment; that at no time was decedent restored to competency either by act of the hospital or court; that at the time of the commitment respondent had given a history of decedent which indicated that after a suicide attempt in 1954 decedent felt that he was being persecuted and followed by others; that he became involved in excessive litigation, wrote innumerable letters to various public officials and felt that his wife was being menaced by gangsters; that decedent had delusions that he was a part of military intelligence, and he wrote letters to various army officers; that in 1956 decedent felt that someone was trying to bomb his property and destroy him. The bomb

proved to be a dud, but decedent still maintained these beliefs and was completely obsessed with the idea of bombs and explosives and was doing considerable reading and research on explosives; that respondent in October 1958 told hospital officials that decedent had been talking of writing about a business deal in which he expected to make millions and that he attempted to have warrants issued for the arrest of certain individuals and public officials, and that he was committed on the initiative of the district attorney's office because of various disturbances and the fact that he had threatened various individuals with a shotgun; that respondent *through her attorney* said in a statement in court that on July 24, 1958, decedent was mentally incompetent and unable to comprehend or to follow the proceedings of a trustee's sale or to make a bid at that sale or to secure anyone else to make a bid thereat. He further stated that on December 4, 1958, a diagnosis of decedent was that decedent had a ''Paranoid type of Schizophrenia,'' was ''disconnected in his speech, rambles rather circumstantially about the important people he knows, about international white slavery ring which he uncovered, about the talents of his wife who is a great singer according to him. This man has been receiving Stelazine 20 mg. daily. The drug is being continued and shock treatment is being prescribed.''[5] He further stated that the electroshock treatment was discontinued December 3, 1958, and reinstituted December 19 and was continued until December 30 (the date of the will) and thereafter for a period of time when he was described as delusional, hyperactive at all times, but not improved; that about February 10, 1959, ''a qualified observer'' who saw him at Napa, stated that decedent was delusional. ''I consider him incompetent to handle any important affairs.'' Dr. J. F. Miller's name follows this statement although there is nothing in the declaration to show that this is part of the hospital records.

Declarant then states that he has in his possession four legal tablets in decedent's handwriting representing questions and answers which decedent sent to declarant in December 1961, shortly prior to decedent's death, which were to be propounded to respondent at an anticipated hearing on a petition to have decedent restored to competency. Although

---

[5]Apparently this diagnosis was made by ''K. W. Haworth, M.D.'' although the declaration does not say so nor does it state that it is a hospital record.

they deal "exhaustively with almost [every] phase of the relationship" between respondent and decedent, at no time does decedent therein refer to any will. Declarant has received innumerable letters from decedent dealing with the matters of the guardianship and of the petition for restoration, but in none of them did decedent refer to any will. In the files of the San Francisco Superior Court there is an order adjudging decedent to be a mentally ill person in need of "supervision, treatment, care or restraint and/or of such a mental condition that he is dangerous to himself" and that this judgment was in effect at the time of the execution of the will.

We will first consider the showing as to whether or not there was a triable issue upon whether decedent was of sound and disposing mind.

An examination of Attorney Shapiro's declaration fails to disclose any matter bearing on the subject to which he could testify. He clearly is not competent to testify to the diagnosis which is set forth in the declaration nor its meaning. The declaration does not state that the doctors whose names appear in the declaration will testify to the matters therein set forth or at all. There is nothing in the declaration to indicate that decedent's "legal questions" sent to the attorney bear upon decedent's testamentary capacity, nor does the fact that decedent did not mention the will to the attorney do so.

In its essence the only claim made that there was sufficient evidence set forth on behalf of appellant is the fact of decedent's commitment to Napa State Hospital.

█ This brings us to the question—Do the mere facts of adjudication of incompetence as dangerous to oneself and others, and the subsequent appointment of a guardian, raise a triable issue of fact as to the incompetent's capacity to make a will? This question must be determined in face of the fact that in this matter no statement has been made that anyone, competent or otherwise, would testify that decedent was not competent to make a will so that it is the mere adjudication of incompetency for purpose of commitment to a mental institution and of the appointment of a guardian of the estate of the person committed which we must consider. Based upon such a limited issue the answer must be that those facts do not raise the issue of fact necessary in this proceeding. █ The tests of competency for the purpose of obtaining care and treatment at a mental institution are

entirely different from those for determining ability to execute a will. A person's mental condition may be such that it is necessary to commit him to a mental institution for the protection of himself and others and yet he may be perfectly competent to make a will.

The test for determination of the latter competency is set forth in *Estate of Wolf* (1959) 174 Cal.App.2d 144 [344 P.2d 37], where the court said: "As we recently stated in *Estate of Glass*, 165 Cal.App.2d 380, 383 [331 P.2d 1045] : 'It is familiar law that a testator is competent to make a will if he has sufficient mental capacity to understand the nature of the testamentary act, to understand and recollect the nature and situation of his property and to remember and understand his relations to the persons who are the natural objects of his bounty. (*Estate of Gilbert,* 148 Cal.App.2d 761, 767 [307 P.2d 395] ; *Estate of Sexton*, 199 Cal. 759, 764 [251 P. 778] ; *Estate of Smith*, 200 Cal.152, 158 [252 P. 325] ; *Estate of Arnold,* 16 Cal.2d 573, 586 [107 P.2d 25].)' " (Pp. 149-150.) (See also 53 Cal.Jur.2d, Wills, § 92, p. 323; *Estate of Fritschi* (1963) 60 Cal.2d 367, 372 [33 Cal.Rptr. 264, 384 P.2d 656].) Nowhere in appellant's declarations does it appear that there is evidence that decedent did not have the capacity to understand the nature of the act of making a will, to understand and recollect the nature and situation of his property or to remember and understand his relations to the persons who are the natural objects of his bounty.

On this latter subject there was the transcript of testimony taken in the probate homestead case of five witnesses to the effect that decedent regarded his wife as the natural object of his bounty, and that he intended to leave everything to her. As said in *Estate of Comino* (1942) 55 Cal.App. 2d 806, 813 [131 P.2d 599], "An instrument is not to be considered as unnatural where it provides for a wife to the exclusion of brothers or sisters."

In *Estate of Lingenfelter* (1952) 38 Cal.2d 571, 581 [241 P.2d 990], the court said, quoting from *Estate of Perkins,* 195 Cal. 699, 703-704 [235 P. 45] : " 'Every mental departure from the normal will not destroy a testamentary disposition. ... Mental derangement sufficient to invalidate a will must be insanity in one of two forms: (1) insanity of such broad character as to establish mental incompetency generally, or (2) some specific and narrower form of insanity under which the testator is the victim of some hallucination or delusion. Even in the latter class of cases, it is not sufficient merely to

establish that a testator was the victim of some hallucination or delusion. The evidence must establish that the will itelf was the creature or product of such hallucination or delusion; that the hallucination or delusion bore directly upon and influenced the creation and terms of the testamentary instrument.' [Citations.]

" 'Testamentary capacity cannot be destroyed by showing a few isolated acts, foibles, idiosyncrasies, moral or mental irregularities or departures from the normal unless they directly bear upon and have influenced the testamentary act.' [Citations.]" *Lingenfelter* points out, also, that the fact that a person committed suicide (in our case decedent at one time attempted suicide) is "relevant upon the question of sanity, but standing alone is insufficient to show an insanity so complete as to destroy testamentary capacity. [Citation.]" (P. 581.)

As to the effect of the appointment of a guardian of the incompetent's estate, applicable here is the following from *Estate of Worrall* (1942) 53 Cal.App.2d 243, 247 [127 P.2d 593], " '... Proof of incompetency in a guardianship proceeding is evidence of mental condition on the date of the adjudication but it is not *prima facie* evidence of testamentary incapacity so as to shift the burden of proof to the proponent of the will....'"

It does not appear in our case that the doctor, referred to in appellant's attorney's declaration, who considered decedent incompetent "to handle any important affairs" was considering decedent's business affairs only, or whether his opinion extended to include a sufficient lack of mental capacity to fall below the legal standard of testamentary capacity. Moreover, there is no statement that the doctor would testify as to the matter set forth.

"Ability to transact important business, or even ordinary business, is not the legal standard of testamentary capacity; though it seems to be quite generally but mistakenly supposed, outside the ranks of the legal profession, that a capacity to transact important business is the criterion of fitness to make a valid will. ... A person who has mental power to understand and to transact the ordinary business affairs of life doubtless has capacity to make a valid will. But the converse is not necessarily true. ▮ Mental perception and power to think and reason of a lesser degree than that which is required in the understanding and transaction of ordinary business may be all that is requisite to the full understanding of everything involved in the execution of a

will." (*Estate of Sexton* (1926) 199 Cal. 759, 768-769 [251 P. 778].)

█ "It is well settled that mere proof of mental derangement or even of insanity in a medical sense is not sufficient to invalidate a will, but the contestant is required to go further and prove either such a complete mental degeneration as denotes utter incapacity to know and understand those things which the law prescribes as essential to the making of a will, or the existence of a specific insane delusion which affected the making of the will in question. [Citations.]

" 'In considering the evidence it is important, preliminarily, to observe that it is not every form of insanity, not every mental departure from the normal, which destroys an otherwise valid testamentary act. █ The rule of law is not that no person who is insane may make a valid will, but that the will of no person who, by reason of insanity, is incapable of making valid testamentary disposition shall be upheld.' (*Estate of Chevallier*, 159 Cal. 161, 168 [113 P. 130].)" (*Estate of Arnold* (1940) 16 Cal.2d 573, 585-586 [107 P.2d 25].)

*Estate of Fossa* (1962) 210 Cal.App.2d 464, 469 [26 Cal.Rptr. 687], holds that an inference of lack of testamentary capacity *upon the date of the adjudication* may be drawn from an adjudication of incompetency in a commitment proceeding. Likewise in *Estate of Wolf, supra,* 174 Cal.App.2d 144, it was held that an adjudication of incompetency in a guardianship proceeding, raised an inference of testamentary incapacity *at the time of the appointment of the guardian.* It then pointed out that where the will is executed subsequently thereto there must be evidence to show that the decedent's mental condition had not materially changed in the interval between the appointment of the guardian and the execution of the will. *Estate of Krause* (1945) 71 Cal.App.2d 719, 725 [163 P.2d 505], also holds that the finding of incompetency in the guardianship proceeding raises an inference of testamentary incompetency *as of the date of the finding.* (See *Estate of Watson* (1961) 195 Cal.App.2d 740, 743 [16 Cal.Rptr. 125].) In all cases in addition to the adjudication of incompetency there was evidence as to the testator's testamentary capacity at the time of the execution of the particular will. There is no case holding that the mere fact of adjudication of incompetency in a commitment proceeding or in a guardianship proceeding

without other evidence as to the mental condition of the testator at the time of making a will at a later date would justify a finding of lack of testamentary capacity on the later date. In the case at bench we have no evidence as to decedent's testamentary capacity at the time of making the will other than the fact of his commitment and the appointment of a guardian, but we do have appellant's statement in her deposition of August 9, 1961, "I don't think he [decedent] was incompetent at any time" and that he was "Not mentally ill. No."

*In re Zanette* (1949) 34 Cal.2d 136, 141 [208 P.2d 657], holds that there are "definitive variants of the term 'insanity' and the possibility of its use in different situations. Among others can be noted: (1) insanity or incompetency with relation to capacity to contract (Civ. Code, §§ 38-40); (2) insanity or incompetency with relation to capacity to make testamentary disposition [citations]; (3) insanity with relation to capacity to commit crime (Pen. Code, § 26); (4) insanity as 'mental illness' which warrants confinement under provisions of Welfare and Institutions Code, division 6; and, (5) insanity or incompetency pursuant to which, under Probate Code, section 1460, letters of guardianship are issued. 'Insanity' may and does mean a variety of different things. Depending on the pertinent statute, a variety of issues of fact can be the subject of litigation."

In *Estate of Fosselman* (1957) 48 Cal.2d 179 [308 P.2d 336] (cited by appellant) there was no adjudication of incompetency. As the court said, there was an abundance of evidence from which the trial court could reasonably conclude that the testatrix was suffering from senile dementia in an advanced stage and that she could not comprehend the extent and character of her property or her relation to those who would be the natural objects of her bounty. Appellant refers to no such evidence in the case at bench. In *Estate of Fossa, supra,* 210 Cal.App.2d 464 [26 Cal.Rptr. 687], the testator made his will within 30 minutes of being declared incompetent by order of the superior court. There was ample evidence of his lack of testamentary capacity.

There is no competent evidence alluded to in the affidavit of counsel for contestant which, if accepted as true, raises a triable issue of fact. The fact of the adjudications alone, without some offering of testimony of the symptoms which went into the court's determination does not establish either "such a complete mental degeneration as denotes utter

incapacity to know and understand those things which the law prescribes as essential to the making of a will, or the existence of a specific insane delusion which affected the making of the will in question." (*Estate of Arnold, supra,* 16 Cal.2d 573, 585-586.) ██ The fact, if it be a fact, that in the opinion of counsel for appellant decedent was at one time incompetent to conduct his business with respect to a trustee's sale of decedent's property, does not bear directly on his incompetency with respect to his testamentary powers. ██ Moreover, counsel for contestant clearly cannot testify to this of his own knowledge, since it was alleged to be a comment of counsel for respondent. ██ Finally, the disposition of decedent's estate is clearly a "natural" one and absent some showing that the sister had a greater claim to decedent's affections than did his wife, no inference that it is not a natural disposition can be made, particularly in view of the testimony offered in support of decedent's continued affection for his wife. Thus, summary judgment was properly granted on this ground.

## Undue Influence.

Appellant contends that a presumption of undue influence existed because of (1) the relationship of husband and wife between decedent and respondent; (2) the relationship between them of ward and guardian; (3) disposition of property under the will contrary to a prenuptial agreement and (4) no recollection of the will by decedent.

██ As to points (1) and (2) (the relationship between decedent and respondent) the following proposition of law applies: "For the presumption of undue influence to arise, it is not enough that a confidential or fiduciary relationship shall have existed between the testator and the person alleged to have exerted undue influence. There must have been, in addition, some sort of activity or participation in the execution or preparation of the will, as well as an undue benefit given to the same or another person by the will thus procured." (53 Cal.Jur.2d, Wills, § 186, p. 434; accord: *Estate of Fritschi, supra,* 60 Cal.2d 367, 373-374; *Estate of Arnold, supra,* 16 Cal.2d 573, 581.) ██ There is nothing in the affidavit of counsel which intimates that respondent coerced, intimidated or in any way participated in the execution or preparation of the will or that she received an undue benefit. She was his wife. She had worked with him in his business ventures for over 10 years. Moreover, in the deposition of contestant she admits she does not know whether

there was any undue influence exerted at all and that the allegation in this regard was mere supposition on her part.

None of the indicia of undue influence required by *Estate of Bourquin* (1958) 161 Cal.App.2d 289 [326 P.2d 604], cited by appellant, to exist *in addition* to a confidential relationship exists in this case, except possibly (2), which alone is not sufficient to constitute undue influence. ▮ Those indicia are: " ' " (1) The provisions of the will were unnatural. . . . ; (2) the dispositions of the will were at variance with the intentions of the decedent, expressed both before and after its execution; (3) the relations existing between the chief beneficiaries and the decedent afforded to the former an opportunity to control the testamentary act; (4) the decedent's mental and physical condition was such as to permit a subversion of his freedom of will; and (5) the chief beneficiaries under the will were active in procuring the instrument to be executed." *(Estate of Yale, 214 Cal. 115, 122 [4 P.2d 153].) ' "* (P. 299.) ▮ As to point (2), *supra,* that contention is not supported by the record. The prenuptial agreement (subsequently declared invalid in the companion case already referred to) only provided that respondent would not seek a family allowance or seek any interest in her husband's estate. Respondent does not assert any interest in the estate except that expressly provided for by her husband in the will which was made subsequent to the agreement. Point (4), *supra,* is not substantiated. All appellant's counsel states in his declaration is that decedent did not mention the will to him. There is no evidence that decedent forgot the will.

*Estate of Llewellyn* (1948) 83 Cal.App.2d 534 [189 P.2d 822, 191 P.2d 419], relied upon by appellant, is not in point. That case holds that existence of a confidential relationship is not enough to establish undue influence. ▮ There must appear also that the beneficiary "has actually participated in procuring the execution of the will." (P. 561.) There must be "an actual showing of some sort of pressure which overpowered the mind and mastered the volition of the testator at the very moment of execution of the will." (P. 561.) No such evidence has been indicated to exist in our case. Nor is *Estate of Teel* (1944) 25 Cal.2d 520 [154 P.2d 384], applicable here. That case holds: "A fiduciary relationship exists between husband and wife in respect to the issue of undue influence in a will contest, and where such fiduciary relationship is combined with unduly profiting by the will, and its

being unnatural and activity on the part of the proponent in procuring its execution, we have persuasive evidence of undue influence. [Citations.]'' (P. 528.) Other than the fact that decedent and appellant were husband and wife none of the elements mentioned in *Teel* appear in this case.

### ALLEGED REVOCATION OF WILL

There is no foundation whatever for this contention. Appellant in her deposition admitted that as far as she knew decedent did not revoke the will nor is there any indication anywhere that decedent desired or attempted to revoke the will.

The will itself indicates no emotional or mental instability. It is written in a firm hand, without any wavering, or indication of nervousness, trembling or mental stress. Applicable here is the following from *Estate of Arnold, supra,* 16 Cal.2d 573, 589: ''We are in accord with the opinion of the trial court respecting the will, stated in the following language: 'The will is a perfectly natural will and bears no evidence upon its face of any mental weakness of the testator, much less anything amounting to mental incapacity in a legal sense. On the contrary it is convincing evidence of his testamentary capacity, for it contains within itself direct evidence of every element of competent ability in this regard.'''

Thus, against the statement of overwhelming evidence presented by the respondent on the motion for summary judgment appellant states no contrary or competent evidence to indicate that there are any issues of fact to be tried. Therefore, the granting of the summary judgment was proper.

The judgment is affirmed.

Sullivan, J., and Molinari, J., concurred.