Filed 2/2/21  Estate of Sherman CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| Estate of EDWARD MARTIN SHERMAN, Deceased. | B300842 |
| BARBARA GARRISON, | (Los Angeles County Super. Ct. No. 18STPB03628) |
| Petitioner and Appellant, | |
| v. | |
| RANDI SUE BERGER, as Executor, etc., et al., | |
| Objectors and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Barbara Johnson, Judge.  Affirmed.

Law Offices of John A. Belcher and John A. Belcher for Petitioner and Appellant.

Steinhart Law Offices and Terran T. Steinhart for Objector and Respondent Randi Sue Berger.

Lewitt, Hackman, Shapiro, Marshall & Harlan, Kira S. Masteller, and Stephen T. Holzer for Objector and Respondent Fred Berger.

_____

## INTRODUCTION

The November 2017 holographic will of decedent Edward Sherman (the "Contested Will") left his entire estate to appellant Barbara Garrison. In August 2019, the probate court invalidated the Contested Will, finding Edward lacked testamentary capacity to draft it, and that it was procured through undue influence. Barbara asks us to reverse the court's findings, contending both that the court used the wrong legal standard in judging Edward's testamentary capacity, and that substantial evidence supports neither the finding of lack of capacity, nor the finding of undue influence.

Preliminarily, we note that Barbara has forfeited both substantial evidence challenges by failing to set forth all the relevant material evidence, in favor of highlighting only those facts favorable to her position. In any case, because we find both that the court used the correct standard to judge Edward's testamentary capacity, and that substantial evidence supports the court's finding that he lacked such capacity, we need not address whether substantial evidence supports the court's finding that the will was procured by undue influence. We affirm.

2

## STATEMENT OF RELEVANT FACTS

### A.    *Edward's Wills[1]*

Edward, a lawyer, drafted three holographic wills, each on a single piece of paper from a legal pad.  The first two, drafted in July 2014 and December 2016, were written neatly, with few spelling and grammatical errors.  They left either $40,000 (July 2014 will) or $75,000 (December 2016 will) to Barbara, with the remainder of Edward's estate going to his sister Marcia.[2]  Both wills also provided contingencies for what would occur should either Barbara or Marcia predecease Edward.  The December 2016 will additionally revoked Edward's previous will, and named an executor (Marcia, or Randi Sue Berger (Marcia's daughter) should Marcia predecease Edward).

The Contested Will, drafted on November 8, 2017, read:

"My Last Will and Testiment [*sic*]

"I Edward M Sherman, hereby giives [*sic*] to Barbara Garrison my home at 15743 Hesby Strreet [*sic*], Encino, California 91436 and all my other money and possesions [*sic*].

---

[1]    Because some of the parties share a surname, we refer to most of the witnesses by their first names.

[2]    The remainder of the estate included Edward's house, valued at over $1,000,000.

"Nov. 8, 2017

"This is my last Will and Testiment this [*sic*].

"Edward Martin Sherman"

The first line of the Contested Will ("My Last Will and Testiment" [*sic*]) was written on the unlined upper portion of the paper, and the writing sloped upward. Of the remaining six lines written in the lined portions of the paper, three also slanted upward and did not remain within the space designated for writing.

## B.   *Probate Pleadings*

Edward died on December 25, 2017. In April 2018, Barbara filed a probate petition to be named the administrator of Edward's estate, attaching the Contested Will. In May 2018, Marcia objected to Barbara's petition, alleging Edward was without capacity to make the Contested Will, and that Barbara had "made [Edward] write" it.[3] One week later, Marcia petitioned to have herself named the administrator of Edward's estate, contending Edward died intestate.

---

[3]    As part of the objection, Marcia included an exhibit showing a text message from Edward's caregiver to Randi, attaching a picture of the Contested Will and stating: "She just made him write this while I was talking to your mother on the phone." However, this exhibit was not introduced at trial, and Randi's testimony regarding what the caregiver said to her was stricken as hearsay. The caregiver was not a witness at trial.

In November 2018, after Marcia passed away, Marcia's son Fred petitioned to have himself named the administrator of Edward's estate, also contending Edward died intestate. In January 2019, Randi (Fred's sister) petitioned for the December 2016 will to be probated with her as executor, and objected to Barbara's petition. In February 2019, Fred objected to Randi's petition, questioning both the validity of the December 2016 will, and whether Randi would act neutrally as executor.[4] Barbara also objected to Randi's petition.

### C.  *Probate Trial*

A four-day bench trial began in June 2019. Seven witnesses testified. The relevant portions of their testimony are summarized below.

### 1.  Barbara Garrison

Barbara testified she met Edward in 1988, started dating him in 2008, moved in with him in April 2012, and lived at his home until December 2017. In November 2017, Barbara and Edward went to his bank twice (both times after November 8). At the first visit, a bank manager informed Edward that Marcia had moved all of the money out of his account.[5] Edward asked the bank manager to

---

[4]  Fred later agreed the December 2016 will was valid, though he still opposed Randi's appointment as executor.

[5]  On cross-examination, Barbara was shown the November 2017 bank statement for that account, and confirmed that the
(*Fn. is continued on the next page.*)

bring him a phone, and he immediately called Marcia to ask where the money was. Barbara was "listening in" and overheard Marcia say she had moved the money out of Edward's account because she needed it to "take care" of him, and that she was permitted to do this because he had given her power of attorney. During the second visit to the bank, which took place on November 27, Edward was able to withdraw $3,000 from his account.

After the first November visit to the bank, Edward told Barbara he was very upset that Marcia was taking all his money, and that he was going to "'fire her.'" Barbara never encouraged Edward to fire Marcia, never disparaged her, and stayed out of the interactions between the two. Barbara received a voicemail from Marcia stating Edward had fired her. A partial transcript of the voicemail reads:

> "Hi Barbara[,] it's Marcy[.] _ fired me last night[,] he said I'm doing a more harm than good [sic] and I'm spending all his money on things he doesn't want [though] I haven't spent a penny _____ ·so anyhow he doesn't want me doing anything else for him[,] he does not want me involved so um I'm going to give everybody your number[.

---

account had a balance of $200,323.61 at the beginning of November, and $97,416.48 at the end, and the only deposit during the month was an interest payment (i.e., at no time was the account empty).

6

H]e has _ _____ discharge date uh after Thursday possibly Saturday or Sunday if the bacterial infection that has been causing diarrhea clears up [(]they finally diagnosed when I insisted they do a culture[)] and I'll send you all the information _ ____ all the relevant contacts for his care and I think you'll [*sic*] be more comfortable with you anyway so uh I'll get everything to you as soon as possible and good luck[,] bye-bye."

However, Barbara testified this voicemail was left on October 25, 2017, before the November bank visits. She also testified it was not unusual for Edward to get upset and lose his temper, and that she did not take over Edward's finances or healthcare decisions after Marcia's voicemail. Instead, Marcia continued helping with those matters.

According to Barbara, at some point, Marcia had asked her to move out of Edward's house, but she refused. On November 8, Barbara and Edward were "talking about the whole situation and his health." They were sitting around, watching television, and Edward said, "'I have come to the conclusion that Marcy is not going to work with you.'" He went on, "'I won't be able to protect you any more or help you, so I am going to do this.'" He picked up a legal pad and declared he would leave everything to Barbara. He

7

then drafted the Contested Will of his own volition, without influence from her. While he was writing the will, she was massaging his legs, because he was in "grievous pain." It took him 10 to 15 minutes to draft the will.

After the will was written, Edward read it to her, and then handed it to her to read herself. She asked whether he was sure he wanted to do this, and he said he was. Barbara opined that "Edward Sherman knew what he was doing."

The legal pad on which the Contested Will was written sat on the coffee table for several days, before Barbara finally tore the page off the pad, and took possession of it. Edward had told her to "hang on to it" after he wrote it. Edward had three other wills in his possession (his December 2016 will, Marcia's will, and the will of his friend and client Cheryl Christensen), but the Contested Will was never stored with the other wills. Edward never told Barbara to destroy the December 2016 will.

### 2.  Cheryl Christensen

Cheryl first met Edward in 1974, and he was her "best friend," as well as her manager and attorney. She spoke with Edward on November 16, 2017, during his birthday. They reminisced about the music business, and he advised her regarding a business deal she was involved in. Cheryl asked Edward if he had "taken care" of Barbara,

in case something happened to him, and he responded, "Yes, I have protected her."

### 3.     Dr. Timothy Lee

Dr. Lee was a skilled nursing facility physician at the Windsor Terrace Medical Center (Windsor Terrace). Dr. Lee first met Edward on his admission to that facility on October 6, 2017, at which time Edward "was clear." On October 16, Edward was taken to a hospital, but was readmitted to Windsor Terrace on October 19. On October 20, 2017, Edward could give his name, but did not know what year it was. He was "a little clearer" during the afternoon, but "would get confused in the evening." A document dated October 20 stated that Edward had "fluctuating capacity to understand and make decisions" because of "dementia." Dr. Lee explained that fluctuating capacity meant that Edward sometimes had the capacity to understand and make decisions, and sometimes did not.

Edward was discharged from Windsor Terrace on October 31, 2017; toward the end of his stay, he "was confused most of the day." Dr. Lee opined that during the time Edward was at Windsor Terrace, he lacked the cognitive capacity to make medical decisions for himself. When shown a Windsor Terrace discharge form dated October 31, 2017, which stated that Edward had "mild cognitive impairment" (meaning that Edward's cognitive abilities were "in a conditional state between normal aging

9

and dementia"), Dr. Lee testified this was an inaccurate assessment.

### 4.  Beth Chrisman

Beth Chrisman, an expert forensic document examiner, testified that Edward personally wrote and signed the Contested Will.  She also opined that the writing did not appear as if someone had dictated the will to him.

### 5.  Randi Sue Berger

Randi testified that Edward was her uncle (her mother Marcia's brother).  Edward helped Randi with legal matters, and she saw him a couple of times per month.  Until the last month of his life, Edward called Marcia several times a day.  He often left angry messages for Marcia and for Randi, but then would call back the next day, changing what he said.

Randi also testified that, after Barbara moved in with Edward, she was no longer permitted to visit with him in his house, but was required to meet with him outside.  After Edward became ill, Randi was allowed into the house again, and saw the house was filthy -- it had worsened substantially after Barbara moved in.  Randi later testified that even when he was ill, she and her mother were sometimes "locked out" of the house.

### 6.  Dr. Robert Kahn-Rose

Dr. Kahn-Rose, an expert witness in the field of geriatric psychiatry, examined Edward on November 30,

2017. As part of the exam, he administered a Montreal Cognitive Assessment. Edward scored 11 out of a possible 30 points, indicating severe dementia.

Dr. Kahn-Rose testified that Edward had severe dementia, and was impaired across all cognitive realms except for attention, "which wasn't too bad." He had deficits in "short and long-term memory, language, all aspects of higher cognitive functioning, insight, judgment, ability to change sets or inhibit responses, to plan, to organize . . . ." These were areas "critical to being able to make judgments, to make assessments of information, to try to discern really what was going on at any particular time . . . ." Dr. Kahn-Rose testified that it was "very unlikely" Edward's cognitive state had occurred overnight; in Dr. Kahn-Rose's opinion, Edward had lacked cognitive abilities throughout November 2017.[6] He also opined it was extremely likely that Edward was highly susceptible to undue influence for the entire month of November.

Dr. Kahn-Rose additionally testified that the misspellings in the Contested Will, along with the way the writing did not stay within the lines, raised concerns about the writer's cognitive abilities. He had no concerns

---

[6]     Dr. Kahn-Rose understood that to have testamentary capacity, individuals must be aware of the testamentary act, understand the objects of their bounty (specifically the relationship between the heirs and the testator), and understand their assets in significant detail. Dr. Kahn-Rose did not ask Edward about his bank accounts, any art, cars, or jewelry.

11

regarding the July 2014 and December 2016 wills, noting they were more thorough, in-depth, and legible, compared to the Contested Will.

### 7. Fred Berger

Fred testified that Edward was his uncle, and a good friend. Edward was also close to Marcia, Randi, and Fred and Randi's sister. Because Fred was the executor of Marcia's estate, he reviewed bank documents in her possession; these documents showed that Marcia paid for Edward's living and healthcare expenses.

## D. *The Court Invalidates the Contested Will*

On August 21, 2019, the court issued a ruling. We summarize the relevant portions below.

### 1. Testamentary Capacity

The court found that Edward wrote, dated, and signed the Contested Will, and that "[o]n its face the instrument discloses a testamentary intent." The court recognized that testamentary capacity is presumed, and that it was the contestant's burden to prove lack of testamentary capacity or undue influence. Nevertheless, the court found that Edward "did not have capacity to make" the Contested Will. The court noted Dr. Lee's testimony that toward the end of his stay at Windsor Terrace, Edward "did not have decision making capabilities as it related to medical decisions for himself" because he was "confused most of the day." It also cited Dr. Kahn-Rose's testimony that he had no concerns

12

regarding Edward's July 2014 or December 2016 wills because they were detailed, thorough, and legible, but the Contested Will "presents another picture."

The court referenced the 11 out of 30 score that Edward received on the Montreal Cognitive Assessment, and that "Dr. Kahn[-]Rose interpreted this score to mean [Edward] Sherman suffered from severe dementia, [and] that he had impairment across most all cognitive realms. [Specifically, Edward] Sherman had deficits in short and long-term memory, language, [and] all aspects of higher cognitive functioning—insight, judgment, ability to change sets or inhibit responses, [and] to plan and organize. Those areas are critical to being able to make judgments, to make assessments of information, to discern what is going on at any particular time. In short, [Edward] Sherman's decision[-]making was 'profoundly impaired'. This condition did not occur overnight . . . . [Dr.] Kahn-Rose opined that [Edward] Sherman lacked cognitive abilities throughout the month of November . . . ." The court agreed with Dr. Kahn-Rose's testimony that Edward "did not have the capacity[] to write a Will in November 2017 and understand what he was writing . . . ."[7]

_____

[7] The court also noted that "Dr. Kahn-Rose understood the standard for testamentary capacity as three-fold: 'It is an individual's awareness of what the act was that they were executing at that time, it is an understanding of the natural objects of their bounty . . . . [S]pecifically, the relationship to those individuals and a complete set of the potential natural

(*Fn. is continued on the next page*.)

13

## 2.    Undue Influence

The court went on to find that "[e]ven assuming that the decedent was competent at the time of the signing of the [Contested] Will, the execution of a will is ineffective because the execution was procured by duress, or undue influence."  The court noted that a "presumption of undue influence arises when there is a '"concurrence of all the following elements (1) the existence of a confidential or fiduciary relationship between the testator and the person alleged to have exerted undue influence; (2) active participation by the latter person in the actual preparation or execution of the will; and (3) an undue benefit to such person or another person under the will thus procured."'"  The court found:  (1) it was undisputed that Barbara and Edward were in a confidential relationship; (2) Barbara "actively participated in the preparation and execution of the [Contested] Will"; and (3) Barbara "unduly benefited under the [Contested] Will . . . ."

The court therefore granted Randi's petition for probate of the December 2016 Will, appointed Randi as executor, and denied Fred's and Barbara's petitions.  Barbara appealed the same day.

---

objects.  And it is an understanding of the actual bounty, the nature of the bounty.  In some significant detail.  [*sic*]'"

14

# DISCUSSION

## A. *Barbara Has Forfeited Her Substantial Evidence Challenges*

"'It is well established that a reviewing court starts with the presumption that the record contains evidence to sustain every finding of fact.'" (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.) When a party challenges a finding on appeal, it must "'demonstrate that there is *no* substantial evidence to support the challenged findings.'" (*Ibid.*) A recitation of only favorable evidence is not the "'demonstration'" contemplated under the above rule. (*Ibid.*) If a party fails to set forth "'*all* the material evidence on the [appealed] point and not merely [its] own evidence . . . the error is deemed to be waived.'" (*Ibid.*, some italics omitted.)

Here, Barbara fails to set out much of the evidence that was unfavorable to her. For example, while Barbara cites an October 31 document from Windsor Terrace stating that Edward had only a "mild cognitive impairment," she fails to mention that Dr. Lee testified he believed this assessment was inaccurate, and that in his opinion, Edward was "confused most of the day" toward the end of his stay, and lacked capacity to make medical decisions for himself. Similarly, while Barbara points to Dr. Kahn-Rose's testimony that Edward knew his address and his family, educational, and professional history, and had some awareness of his own impaired medical condition, she fails

15

to note Dr. Kahn-Rose's testimony that Edward scored only 11 out of 30 on the Montreal Cognitive Assessment, indicating severe dementia.

Barbara claims that within a week of October 17, 2017 (when Edward gave Marcia his power of attorney), Marcia had transferred "most of Edward's funds" into a bank account that she exclusively controlled. But Barbara does not note her own testimony that there was over $200,000 in the account at the beginning of November, and almost $100,000 at the end of November. Barbara asserts that Edward's firing of Marcia -- which occurred the night before Marcia's October 25, 2017 voicemail -- was in reaction to Edward's discovery that Marcia had moved Edward's money out of his account, but says nothing of her own testimony that Edward did not make this supposed discovery until after November 8, 2017.

Given Barbara's omission of these and other pieces of evidence that support the court's findings, we deem her substantial evidence arguments forfeited. (*Foreman & Clark Corp. v. Fallon*, *supra*, 3 Cal.3d at 881.) In any case, as discussed below, substantial evidence supports the court's finding that Edward lacked testamentary capacity.

### B. *The Court Did Not Err in Finding Edward Lacked Testamentary Capacity*

Acknowledging that testamentary capacity is presumed, that the standard for finding testamentary capacity is "exceptionally low," and that it was Fred's and

16

Randi's burden to prove lack of testamentary capacity, the court nevertheless found Edward "did not have capacity to make the" Contested Will.

Barbara contends the court erred legally by using the wrong standard to consider testamentary capacity, and erred factually because substantial evidence does not support the finding that Edward lacked it.  We disagree.

### 1.    The Court Applied the Correct Standard

When setting forth the general principles relating to testamentary capacity, the court specifically stated that "[t]he standard for testamentary capacity is exceptionally low," "[c]apacity to make a will is presumed," and that "Probate Code section 6100.5 requires that the person understand the nature of the testamentary act, the nature of the property at issue, and his or her relationship to those affected by the provisions of the will."  This is the same standard that Barbara proffers.

The probate court also noted that Dr. Kahn-Rose gave his understanding of "the standard for testamentary capacity as three-fold: 'It is an individual's awareness of what the act was that they were executing at that time, it is an understanding of the natural objects of their bounty . . . . [S]pecifically, the relationship to those individuals and a complete set of the potential natural objects.  And it is an understanding of the actual bounty, the nature of the bounty.  In some significant detail.  [*sic*]'"  Barbara

17

contends the court erred by judging Edward's testamentary capacity using this "more stringent" standard, arguing that the testator needed only "[a] mere 'understanding' of the nature of the property devised" and an understanding of his "relationship *with those whose interests are affected by the will*."

Setting aside whether Dr. Kahn-Rose articulated a more stringent standard, he testified as an expert in geriatric psychiatry, not law. Furthermore, the court did not find that Edward lacked testamentary capacity because he lacked sufficient understanding of his assets or relatives. Rather, the court focused on whether Edward understood the testamentary act, discussing his confusion and cognitive capacity.[8] We see no evidence the court used an incorrect standard.

### 2. Substantial Evidence Supports the Court's Finding

As evidence of Edward's lack of testamentary capacity, the court cited Dr. Lee's testimony that, toward the end of his stay at Windsor Terrace, Edward was "confused most of the day" and lacked decision-making capabilities as it related to medical decisions. The court

---

[8] While Barbara contends the "trial court never found that Edward did not understand the nature of the testamentary act," the court's ruling specifically stated that Dr. Kahn-Rose opined Edward "did not have the capacity[] to write a Will in November 2017 and understand what he was writing," and that the court agreed with Dr. Kahn-Rose's testimony.

also noted Dr. Kahn-Rose's testimony that on November 30, 2017, Edward had scored 11 out of 30 on the Montreal Cognitive Assessment, indicating severe dementia, and impairment "across most all cognitive realms . . . [including] short and long-term memory, language, [and] all aspects of higher cognitive functioning—insight, judgment, ability to change sets or inhibit responses, [and] to plan and organize." These were areas that were "critical to being able to make judgments" and thus Edward's "decision[-]making was 'profoundly impaired.'" The court agreed with Dr. Kahn-Rose that this condition did not occur overnight, that Edward "lacked cognitive abilities throughout the month of November 2017," and that he therefore lacked testamentary capacity to draft the Contested Will on November 8.

On appeal, Barbara makes three arguments: (a) substantial evidence supports a finding of testamentary capacity; (b) Dr. Lee's testimony contradicts itself; and (c) Dr. Kahn-Rose's testimony is insufficient. We are unpersuaded.

### (a) The Evidence Supporting Capacity Is Not Dispositive

Barbara points to several pieces of evidence she contends would support a finding of testamentary capacity, such as Cheryl's testimony regarding the conversations she had with Edward on November 16. She misunderstands the standard of review. "We review the trial court's

19

factfinding for substantial evidence. This traditional standard of review is highly deferential. It has three pillars. First, we accept all evidence supporting the trial court's order. Second, we completely disregard contrary evidence. Third, we draw all reasonable inferences to affirm the trial court. These three pillars support the lintel: we do not reweigh the evidence." (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 581.) "Our job is only to see if substantial evidence exists to support the verdict in favor of the prevailing party, not to determine whether substantial evidence might support the losing party's version of events." (*Id.* at 582.) As discussed above, substantial evidence supports the court's finding that Edward lacked testamentary capacity. Whether other evidence, if credited, would have supported a contrary finding is beside the point.

### (b) Dr. Lee's Testimony Was Not Contradictory

Barbara argues that Dr. Lee's testimony regarding Edward's confusion is inconsistent with his testimony that, on October 20, he had "fluctuating" capacity to understand and make decisions. We see no contradiction. Dr. Lee testified that toward the end of Edward's stay at Windsor Terrace (which ended on October 31), he "was confused most of the day" and lacked the cognitive capacity to make medical decisions for himself. That Edward had fluctuating capacity on October 20 does not mean his capacity was still

20

fluctuating on October 31. Moreover, "the credibility of a witness and the weight to be accorded to his testimony are questions directed to the trial judge, who under proper circumstances may accept all or such part of the testimony of any witness as [he/she] believes to be true, or may reject all or any part which [he/she] believes to be untrue." (*Bechtold v. Bishop & Co., Inc.* (1940) 16 Cal.2d 285, 291.) Thus, the court was free to believe Dr. Lee's testimony that Edward was confused most of the day toward the end of his stay, and disregard any testimony to the contrary.

### (c)  Dr. Kahn-Rose's Testimony Is Sufficient

Barbara argues Dr. Kahn-Rose failed to recognize or consider the "fluctuating capacity" that Edward had on October 20. But a document indicating Edward's fluctuating capacity on October 20 does not contradict Dr. Kahn-Rose's opinion that Edward lacked capacity to draft a will throughout the month of November, especially in light of Dr. Lee's testimony that toward the end of October, Edward was confused most of the day. "Testamentary incompetency on a given day . . . may be proved by evidence of incompetency at times prior to and after the day in question." (*Estate of Fosselman* (1957) 48 Cal.2d 179, 185.) "Once it is shown that testamentary incompetency exists and that it is caused by a mental disorder of a general and continuous nature, the inference is reasonable [citations], perhaps there is even a legal

21

presumption [citations] that the incompetency continues to exist. Such an inference is particularly strong in a case such as this in which the decedent was suffering from senile dementia, a mental disorder that becomes progressively worse." (*Id.* at 186.)

Barbara also points out that Dr. Kahn-Rose testified that when Edward drafted the Contested Will, "'it is possible, given his training and expertise, historically, that he did know what a will is.'" But whether, on November 8, Edward understood the definition of a will in the abstract is a different question than whether he knew that by writing the words he did, he was creating a will that would leave everything to Barbara. Given Dr. Kahn-Rose's opinion that Edward was without capacity to draft a will in November, we think his later testimony is more reasonably interpreted to mean that Dr. Kahn-Rose could not rule out the possibility that, given Edward's years of experience as an attorney, he may generally have understood the concept of a will, not that he understood he was drafting one. In any event, even had Dr. Kahn-Rose opined that Edward understood on November 8 that he was drafting a will, as stated above, the court was free to disbelieve that portion of Dr. Kahn-Rose's testimony, especially in light of his other testimony, supported by diagnostic testing, that Edward

22

had severe dementia and lacked cognitive capacity throughout November.[9]

### 3.    Barbara's Cases Are Distinguishable

Barbara relies on three vintage cases: *Estate of Bullock* (1956) 140 Cal.App.2d 944 (*Bullock*), *Estate of Glass* (1958) 165 Cal.App.2d 380 (*Glass*), and *Estate of Darilek* (1957) 151 Cal.App.2d 322 (*Darilek*).  All are materially distinguishable.

In *Bullock*, the Court of Appeal reversed a jury's finding that the testator lacked capacity, determining the finding lacked substantial evidence.  (*Bullock, supra,* 140 Cal.App.2d at 944, 948.)  While the testator's physician had opined she was incompetent to make a will, it was undisputed that the doctor had not seen the testator for over four months before she drafted the will.  (*Id.* at 947-948.)  Additionally, the head of the nursing home, while characterizing the testator as "repetitious and childish," acknowledged that she recognized and conversed with people and understood what she was told.  (*Ibid.*)  Here, in contrast, there was substantial evidence of serious cognitive impairment:  testimony from Drs. Lee and Kahn-Rose, as

---

[9]    Barbara also contends the probate court found the Contested Will was signed with testamentary intent.  We interpret the court's statement that "[o]n its face the instrument discloses a testamentary intent," as a simple acknowledgment that the words of the Contested Will indicated a disposition of Edward's assets, not a finding that Edward understood and intended this disposition.

well as Edward's low score on the Montreal Cognitive Assessment, indicating severe dementia.  Moreover, unlike in *Bullock,* the assessments of Edward's cognitive function by Drs. Lee and Kahn-Rose occurred, respectively, less than two weeks before and three weeks after the will was written.

In *Glass*, the issue was whether the evidence was sufficient to support the trial court's finding of testamentary capacity, not whether the evidence was sufficient to support a finding of incapacity.  (*Glass*, *supra,* 165 Cal.App.2d at 383.)  As explained above, the two inquiries are distinct, and only the latter is before us.  Moreover, the *Glass* court observed that "'there was no evidence of any deterioration of [the testator's] physical or mental faculties during the last three or four years prior to his death.'"  (*Id.* at 383, 384.)  Here, there was ample evidence of Edward's cognitive decline.

Finally, in *Darilek*, the probate court granted a motion for nonsuit after the appellant contended the testator lacked capacity.  (*Darilek*, *supra*, 151 Cal.App.2d at 323.)  On appeal, the Court of Appeal affirmed this ruling, finding the "probate court was right in holding that there was no substantial evidence to support a jury's finding of mental incapacity had one been made."  (*Id.* at 328.)  The court noted the will was signed in front of the testator's attorney and two disinterested witnesses, and the testator noted her understanding and agreement with the will.  (*Id.* at 324.)  It further stated the probate court "properly"

disregarded expert opinion regarding lack of capacity as "too speculative" based only on the expert's reading of hospital records and examination of the testator's handwriting. (*Id.* at 326.)[10]  Here, by contrast, the only person present when the Contested Will was drafted and signed was hardly disinterested.  Additionally, two medical professionals who had personally examined Edward testified to his cognitive defects, and one opined Edward lacked the capacity to draft the Contested Will.

### C.  *Undue Influence*

The probate court ruled that even assuming Edward possessed the capacity to draft the Contested Will, it was ineffective "because the execution was procured by duress, or undue influence."  Barbara argues that substantial evidence does not support the court's ruling.  Because we find Barbara has forfeited her substantial evidence arguments, and that in any event, the court did not err in finding Edward lacked testamentary capacity, we need not resolve whether the court erred in finding the Contested Will was ineffective for the additional reason that it was procured through undue influence.

---

[10]  Barbara's characterization of *Darilek* as a case where the "Court of Appeal reversed the trial court and found testamentary capacity" is incorrect.  As the probate court never found the testator lacked testamentary capacity, the Court of Appeal had no occasion to reverse such a finding.

## DISPOSITION

The judgment is affirmed.  Respondents are awarded their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


MANELLA, P. J.

We concur:


COLLINS, J.


CURREY, J.